THE STATE, ALBERT C. COURTER ET AL., PROSECUTORS, v. THE BOARD OF HEALTH OF THE CITY OF NEWARK ET AL.

The board of health of the city of Newark passed a resolution granting a permit to the Newark Sanitary and Manufacturing Company to carry on the business of night scavengering, and designating certain lands of the sanitary company within the city limits as the place for the deposit, and final disposition by manufacture, of the night-soil. The prosecutors attack the legality of this resolution upon the ground that it will injure them specially by causing a diminution in the value of their real estate. *Held*—

1. That the prosecutors were not injured by so much of said resolution as concerned the permit for night scavengering.

2. That under the act establishing boards of health (*Pamph. L.* 1887, *p.* 80) the regulations required to be passed by ordinance were such as prescribed general rules with respect to the several matters entrusted to these boards, and that a particular permit authorizing the doing of that which had already been authorized by ordinance might be granted by simple resolution.

3. That the power to designate a place for the deposit of night-soil, although not given to boards of health in express terms, is necessarily incident to the general jurisdiction of such bodies over cesspools and the removal of their contents.

4. Where a court of law is asked to annul the otherwise lawful action of a municipal body upon the ground that a nuisance is thereby created, a mere apprehension by prosecutors of such a result injurious to their property will not entitle them to any remedy.

*Quære.* As to the right of a prosecutor to attack municipal action upon the ground that it will diminish the salable value of his wife's real estate?

On *certiorari*.

The return to the writ of *certiorari* in this cause brings up·
the following resolutions:

"*Resolved,* That the Doughty Health Association be granted·
a permit from this Board of Health to carry on their business·
of purifying night soil, being the faecal and effete matter from·
the cesspools and privies in the city of Newark, upon the fol-·
lowing terms and conditions, to wit:

" 1. The place to be used by the said Doughty Health Asso--
ciation shall be designated and approved by this board.

" 2. That the said Doughty Health Association shall pay as·
a license fee to the Treasurer of the Board of Health prior to·
or at the time of the granting of the permit hereinafter speci-
fied, the sum of $1,000 for the first year, the sum of $1,500·
for the second year, the sum of $2,000 for the third year, the
sum of $2,500 for the fourth year, and the sum of $3,000 for
the fifth year.

" 3. That the permits to the said Doughty Health Associa-
tion shall be and continue each for the term of one year from
the date thereof, and shall be renewable by the said Doughty
Association for four successive years subsequent to the first
year upon the payment in advance to the Treasurer of the·
board, of the fee for each year on or before the day next after·
the expiration of the permit for each successive year.

" 4. That in addition to the payment of the sums aforesaid,.
the said Doughty Health Association are hereby granted per-
mission to carry on the business of night scavenger in the city
of Newark upon their procuring licenses for each wagon, and·
paying the license fee therefor, according to the rules and regu-
lations of this board, said licenses to be revocable in the same·
manner, and to be given upon the same terms as licenses to·
other night scavengers.

" 5. That the Board of Health shall have power to revoke·
any of the yearly licenses aforesaid at any time, if after the
granting of the same it shall appear to the said Board of Health,.
that the methods and processes of the said Doughty Association·
are dangerous or injurious to public health, or that the opera–

tion of the said business of the said Doughty Association shall prove to be a nuisance to, or injurious to public health, or that the removal of all faecal matter by the Doughty Association shall not be done in a sanitary or inoffensive manner, or that the disposal thereof shall not be harmless and definitive, or that no suitable places and works for its final disposal shall be furnished by said Doughty Health Association, or that any rule, ordinance or provision of the sanitary code be violated by the said Doughty Association.

" 6. Provided, also, that all of the means, processes, apparatus and appliances for this business, the location of works and the fixing of rates for the service shall be subject to the approval of, and in every particular shall conform to the regulations of the Board of Health, and at all times be open to their inspection and investigation.

" 7. Said licenses shall also be revocable if the works and methods of the said Doughty Health Association are not capable or sufficient for the removal in a sanitary and inoffensive manner of all the night-soil or other faecal matter from cesspools and privies as shall be brought to the said works or property of said Doughty Health Association by any and all persons whatsoever."

It appearing at a subsequent meeting that the Doughty Health Association had become incorporated under the law of this state under the name of the Newark Sanitary and Manufacturing Company, it was, upon due application,

"*Resolved,* That the provisions of the said resolution passed May 19, 1891, be and the same are applicable to the Newark Sanitary and Manufacturing Company, as if the said the Newark Sanitary and Manufacturing Company had been mentioned in said resolution in all places where the said Doughty Health Association was mentioned or intended to be referred to.

" 3. *Resolved,* That the premises of said Newark Sanitary and Mfg. Co., near Belleville, bounded south by N. Y. and

Greenwood Lake R. R. Co.'s track and Sayner Chemical Works; east by Passaic river; west by Erie R. R. Co.'s track; north by unimproved lots formerly owned by C. Van Rensselaer, being near Second river, be designated and the same is hereby designated as a dumping ground for any and all duly licensed night scavengers; that is to say, all persons who are licensed to collect and remove night soil, *i. e.*, the contents of cesspools and privies, from any premises in the city of Newark, and all night scavengers may dump all night soil collected by them on the premises aforesaid; this resolution to take effect as soon as said Newark Sanitary and Mfg. Co. signify to the president of this board their readiness to receive and dispose of the night soil, and become duly licensed according to the resolution of May 19, 1891."

Argued at November Term, 1891, before Justices DIXON, REED and GARRISON.

For the prosecutors, *John R. Emery* and *Frederic W. Stevens.*

For the defendants, *Chauncey G. Parker* and *Henry Young.*

The opinion of the court was delivered by

GARRISON, J.   The board of health of the city of Newark has authority, by ordinance, to regulate the cleansing of cesspools and privies and to control the disposition of the contents. *Pamph. L.* 1887, *p.* 80, § 12, ¶¶ V., VII., and the added paragraph I.

The power thus granted has been exercised by the board of health of the city of Newark by the passage of an ordinance in the form of a code, pursuant to section 16 of the act above cited.   In sections 32 to 46 of this code the board declares and defines the manner in which cesspools may be cleaned and emptied, and the contents and other offensive materials removed and disposed of, providing, amongst other things, that every person acting in respect to the matters covered by these

sections shall first obtain a permit from the board of health. Such being the condition of general and municipal legislation, the board, by simple resolution, granted a permit to the defendant, the Newark Sanitary and Manufacturing Company, hedging it about with a number of conditions, the whole constituting the resolution obnoxious to the prosecutors. The resolution thus brought under review concerns two different but closely related matters, the scavengering of cesspools and the like and the removal of the contents to the works of the sanitary company for purification and manufacture. In respect to the scavengering and the requisite license therefor, the prosecutors show no special injury. They have, therefore, no action in respect to that part of the resolution. *Jersey City* v. *Traphagen,* 24 *Vroom* 434.

The parts of the resolution open to the attack of the prosecutors are those in which the premises of the sanitary company are licensed as a place for the deposit of night-soil for purification and manufacture. The objection first to be considered is that the license, or permit, is by simple resolution and not by ordinance. The board of health is a *quasi* corporation and its acts are to be tested by the principles ordinarily applicable to municipal bodies. Elemental among these is that which provides that where no particular mode of action has been prescribed by the legislature, either expressly or by legal intendment, the municipal body may act by simple resolution as effectively as by ordinance. The contention in the present case, therefore, must be that the legislature has prescribed that the proceedings in question must be by ordinance. If such prescription exists it must be found in the sections above cited. The language there employed, in so far as it affects the present case, is, that the board " shall have power to pass ordinances and make rules and regulations in regard to public health for the following purposes ; and such ordinance shall have three readings before its final passage, and at least one week shall intervene between the second and third readings of said ordinance, and a notice stating, &c., shall be published at least one week prior to its final passage in at least

one newspaper," &c.   It is evident that the rules here con-
templated are such as are general in scope and character as
distinguished from the particular regulation of individual
cases.   In other words, the ordinances contemplated by this
statute were those prescribing rules of conduct for, or govern-
ment of, the board of health, not those providing for the exe-
cution of the incidents or details of such matters as the board,
under such ordinances, may lawfully direct to be done.   That
this was the legislative intent is placed beyond question by
section 16, above referred to, wherein it is enacted that " in
the making of ordinances any local board of health may adopt
or ordain the same in the form of a code," thus clearly dis-
tinguishing the class of cases to which the legislative prescrip-
tion was intended to apply.   In the present instance the board
of health, having codified its general rules, had, for the further
protection of the interests committed to its care, ordained that
the refuse material, mentioned in the sections referred to,
should not be deposited upon any grounds " unless pursuant
to a special permit from this board."   I think it is clear that
such a permit may be by simple resolution.   *Greene* v. *Cape
May,* 12 *Vroom* 45 ; *Dennison* v. *City of Burlington,* 13 *Id.*
165 ; *Butler* v. *Passaic,* 15 *Id.* 171.

The form of the permit being disposed of, the remaining
question relates to the substance of the resolution which the
prosecutors contend is *ultra vires—first,* because the board had
no authority to issue a permit for such a purpose ; and, *second,*
because it had no authority to make the exercise of the permit
depend upon the payment of a license fee, or to provide for
the renewal or revocation of the permit as done in the said
resolution.   The reasons grouped under the latter head are
open to the same criticism as the permit for scavengering, viz.,
that the matters complained of do not injure the prosecutors,
with this difference, that if the prosecutors are injured by the
reason first urged, then the charging of the license fee and the
provisions for renewal may be reviewed as part of the unlaw-
ful scheme.   It is evident, therefore, that the question upon
which all depends is, whether, in the language of the ninth

reason, " the board of health of the city of Newark has power to authorize the Newark Sanitary and Manufacturing Company to use as a dumping ground for night-soil the tract of land particularly mentioned in the resolution of the 16th of June, 1891."

The first contention of the prosecutors in this behalf is, that while the board, under its jurisdiction over offensive matters, has authority to " prohibit and remove," it has none to collect or deposit. Hence, while it may prohibit the leaving of offensive matter at some places, or cause or forbid its removal as to others, it cannot affirmatively designate a place free from such prohibitions to which it may remove such materials or cause them to be removed. This construction is evidently too narrow. The legislative language was employed with respect to *quasi* corporations, which it was the object of the legislature to create and to endow with such powers as were essential and necessary to enable them to carry out the purposes of their creation. When the scope of their powers has been defined and the general manner of their exercise indicated, it is a presumption of law that the corporation possesses, likewise, all those powers necessarily and fairly implied in, or incidental to, the powers expressly granted. *Green* v. *Cape May*, 12 *Vroom* 45.

The power to remove any and all offensive matters from any and all public and private places would be nugatory if the board were powerless to provide a place or places to which, and to prescribe the conditions under which, a removal and deposit of such matters might be had. The power " to regulate and control the method and manner of emptying cesspools and privies " has likewise inherent in it the power of both prohibiting and directing where the contents may be deposited. Indeed, the more closely this legislation is studied the more clearly will it appear that one of the most important duties committed to these boards is the regulation of cesspools and the control of the final disposition of their contents. Under the legislative act in question and the sanitary code adopted by the defendant board, there can, I think, be no question as

to the power of the board to designate how, when and where night-soil should be collected, conveyed and deposited, provided the board does not, in the execution of the power thus reposed in it, create a nuisance of which a private prosecutor may complain.

This saving clause brings us to the consideration of the substantial grievance of which the prosecutors complain, viz., that the establishment and operation of works for the purification of night-soil and its manufacture into fertilizing material upon the scale contemplated by these defendants must necessarily be offensive to the senses and injurious to the health; in fine, that the business permitted by this ordinance must inevitably result in a nuisance *per se*, without reference to the manner in which it is conducted. It is to be noted *in limine* that the process to be adopted by the sanitary company in its final disposition of night-soil has been entirely ignored, so that it nowhere appears in the case what the nature of such process is. But by the return to the writ it appears that a written proposition relative thereto was submitted to the board by the Doughty Health Company at a meeting held May 5th, 1891, and that "it was moved that the Doughty Health Company be heard relative to the final disposition of night-soil," and that Mr. C. W. Doughty (presumably the projector of the process which bears his name) appeared on the above subject, after which the proposition of the Doughty company was received and referred to the committee on sanitation, who, at a meeting held two weeks later, recommended the granting of the permit now under discussion. From this return, I think it is fairly to be gathered that the board investigated the process of the Doughty association, aided by the explanation of the projector, before recommending its adoption. That the process thus recommended was deemed feasible without creating a nuisance by those upon whom the board cast the responsibility of making this decision, is evident from the language of the resolution proposed by them upon the coming in of the report. The reservation in this resolution of the power to revoke the license if, *after the granting thereof,* it shall appear that the pro-

cesses of the Doughty company were a nuisance or injurious to public health, or shall not be harmless or inoffensive, clearly indicates that at the time of granting the permit such results were deemed to be obviated by the process, the adoption of which the committee recommended. Moreover, the concluding sections of the resolution not only in the most stringent manner authorize the board of health to regulate the processes, apparatuses and appliances of the business, but also guard both public health and private interests by declaring that "such license shall be revocable if the works and methods of the said Doughty association are not capable or sufficient for the removal, in a sanitary and inoffensive manner, of all the night-soil and other faecal matters from cesspools and privies as shall be brought to the said works or property of the said Doughty Health Association by any and all persons whatsoever." In the face of this declaration it is only by imputing bad faith to the board of health or presuming its negligence that the prosecutors rest their apprehensions of those injurious results which constitute their sole grievance. To rebut the presumption arising from this return the prosecutors have offered no evidence whatsoever, either as to this particular process, which, although unknown to them, they condemn in advance, or as to the general feasibility of the undertaking. Where a court of law is asked to annul the otherwise lawful action of a branch of municipal government upon the ground that it creates a nuisance specially injurious to the prosecutors, a mere apprehension of injurious results is not sufficient. The proofs must show not only that the nuisance will arise, but that the special injury apprehended is reasonably certain to result. The principles which guide a court of law in such cases are not essentially different from those which control courts of equity when asked to interfere, by preliminary injunction, to restrain that which it is apprehended will create a nuisance. In either case the burden is on the complainant. The case of the *Newark Aqueduct Board* v. *City of Passaic*, 18 *Stew. Eq.* 393, is directly in point. The defendants in that case were constructing sewers which would cast their contents

into the Passaic river, from which the city of Newark drew the supply of water consumed by its inhabitants. The danger apprehended was that a nuisance, offensive to the senses and injurious to health, would thereby be caused. The complainants went further than the prosecutors in this case, and offered a large mass of proof tending to show that the apprehension was well grounded. But the Chancellor found that it was, to say the least, doubtful, and refused to enjoin the city of Passaic. This order was subsequently affirmed by the Court of Errors and Appeals, upon the sole ground that as the apprehended pollution had not yet taken place, and it was doubtful whether such pollution would be caused in a degree deleterious to the city of Newark, it was no case for a preliminary injunction. 1 *Dick. Ch. Rep.* 552. I instance this case, although occurring in a court of equity, in preference to many that might have been selected from the law courts, because of the entire similarity of issue to that under consideration. Each concerns the disposal of city filth, and in each the danger apprehended is the pollution of one of the common elements of life, with this difference, that in that case the faecal matter was certain to be mingled with water used for culinary and domestic purposes, whereas, in the present case it is not shown that even the air about the works will be contaminated, still less that it will in a perceptible manner affect the prosecutors, who live at various distances therefrom.

In view of this condition of the proofs, or, rather, in view of this total lack of proof, it can scarcely be said that the prosecutors have shown that what this resolution permits will be a nuisance *per se*, by which they will be specially injured. The case of *Attorney General* v. *Stewart*, 5 *C. E. Gr.* 415, is cited by the prosecutors for the purpose of establishing the fact that analogous businesses, viz., "a slaughter-house in a thickly populated town, or a pig-sty near a dwelling-house, are nuisances *per se.*" So far, however, from laying down any doctrine favorable to the prosecutors, the case cited turned upon this suggestive language, which is the gist of the decision rendered: "These (the nuisances above referred to) are

not nuisances simply because erected within the limits of an incorporated city, and when erected, as these buildings propose to be, seven hundred feet from the nearest dwelling-house owned by any of the complainants, whether they will be a nuisance depends much upon the extent to which the business is carried on and the manner in which it is conducted." And the injunction in this case was refused by Chancellor Zabriskie, because he could not say that the method to be employed in conducting the business of slaughtering hogs, would not effectually prevent its being a nuisance to the nearest complainant who resided seven hundred feet away. In the present case, the prosecutors live, one a quarter of a mile and the other a half a mile from the proposed works, the nearest dwelling-house, and that not one belonging to any of the prosecutors, being distant twelve or thirteen hundred feet, while the efficiency of the process is not drawn in question. So rapidly are new methods discovered and improved processes applied in all departments of trade and manufacture, that one of the most familiar exercises of judicial discretion is the refusal to abate a nuisance where it appears that, under better appliances adopted, or to be adopted, the offensive or injurious effects may be obviated. If this be the tendency of the court, even after judgment, upon what principle can it be asked at the threshold of a public enterprise to arrest the initiation of a process, approved by state agencies and protected by stringent regulations, in respect to the efficiency of which no shadow of doubt is cast by the evidence? It must, moreover, be borne in mind that we are not considering whether these defendants, the board of health and the sanitary company, could, the one license and the other operate, within the city limits and solely for private gain, a business demanding the importation of offensive matters from without. The legislation or municipal license that authorizes cattle to be slaughtered in a densely populated quarter of a city, or that is relied upon to legalize the maintenance of a pig-sty in a yard overlooked by a score of dwellings, rest upon very different grounds and is to be scrutinized under other rules than those

which apply to an enactment passed to enable municipalities to meet the practical question of disposing of the daily excrement of their own inhabitants.   In deciding whether a municipal measure creates a nuisance, which is the contention here, it makes a vast difference in principle whether the offensive element can be fairly ascribed to the municipal action complained of, or whether it is necessarily inherent in the subject which has been placed by the legislature under municipal control.   Whatever of offensiveness, whatever noxiousness is possessed by the subject of municipal action in the case before us, it possessed before it was subjected to the rules of the board of health and irrespective of its regulations.   Such matters are offensive in the place of their first deposit, and, if modern medicine is to be trusted, continue to be a constant menace to private health and to public sanitation.   It was in order to enable municipal bodies to deal with a substance having naturally these qualities that boards of health were created and vested with the powers that we are considering, so that in the construction of their implied powers reference must be had to the nature of the matter committed to them as public agents.   A policy of *laissez faire* is out of the question in dealing with a subject whose inherently offensive qualities increase with every month of a city's growth.   The primitive methods of rural populations are likewise inadequate and will not long be tolerated, so that if relief may not be sought by the introduction of new methods of disinfection and destructive disposition, it is difficult to see any practical solution of the problem.   Fortunately, science and mechanical ingenuity have, in this department, made characteristic advances.   It may almost be said that the measure of our civilization is the distance which separates the sanitary plumbing and odorless excavation of to-day from the period when the sewer was the sidewalk and the only regulation, that which prescribed the warning cry, *"Gardez l' eau !"*

To seek out and employ new methods of disposing of this common bane is not only within the authority of the municipal boards, whose action is now under review, but it is their

chief and most responsible duty, and where the record shows the adoption by such boards of a method looking to this end upon the recommendation of a committee appointed to investigate its feasibility, and by resolution which provides for the revocation of the permit upon the occurrence of any element of nuisance, this court would not, in my opinion, be justified in declaring such action null and void at the suggestion of private prosecutors who apprehend that the process adopted will not prove to be successful.

I have treated the resolution upon its merits, but it has not been without grave doubts as to the standing of these prosecutors to attack it upon the ground set up in their testimony. The prosecutors are three in number, none of whom live nearer than a quarter of a mile from the lands of the sanitary company, and the only grievance to which their testimony is directed is an apprehended diminution in the value of certain city lots mentioned in the evidence. Now, the title of none of these city lots in respect to which this injury is apprehended is in the prosecutors, or in any of them. Albert C. Courter apprehends a depreciation in the value of the property of Lottie G. Courter, his wife, who is not a party. Harrison Van Duyne testifies that the factory would lessen the value of the property of Mrs. Minnie L. Howell, who is not a party, although her husband is, while Margaret J. McCauley, whose lots, suitable for manufacturing purposes, adjoin the land of the sanitary company, is represented only by Philip C. Welsh, who, in an affidavit to procure the writ, says: "Margaret J. McCauley is my daughter; she is the owner of a tract of land; she objects to having night soil collected on lands adjoining her land and has authorized me to take such proceedings as may be necessary to prevent the same." It may well be doubted whether the court should permit litigation to continue in the absence of all the owners of all the lands claimed to be in any wise in danger of being injuriously affected. If the gravamen was an annoyance to the prosecutors in the enjoyment of their rights in their wives' lands a different case would be presented. But the proofs put the grievance squarely

on the ground of the depreciation in the ultimate salable value of the wives' lands. For obvious reasons, however, I have considered the whose case upon its merits. The result reached renders it unnecessary to consider whether the board of health rightfully exercised its authority in fixing the license fee for the privilege granted, for if the prosecutors are not injured by what the resolution authorized the defendant to do they certainly are not wronged by the payment by the defendants into the city treasury of the fee charged for the permit. If the motive of the board had been successfully drawn in question the license fee might have been a feature of the argument, but standing alone, or taken merely in relation to the question of *ultra vires*, it is not a ground for direct litigation.

The writ of *certiorari* will be dismissed with costs.