LEAVITT v. WINDSOR LAND & INVESTMENT CO. et al.

(Circuit Court of Appeals, Eighth Circuit. February 20, 1893.)

No. 181.

1. PARTNERSHIP—WHAT CONSTITUTES—CONTRACT.
Where a contract provides that one of the parties shall contribute the use of a theater building, and is to pay certain expenses incident to the use thereof, and the other party shall contribute his time and skill in the management and conduct of the business, and is to pay a fixed sum per month for lighting and heating the building, a fixed sum for rent, and the "lessor" is to receive "as additional rent one half of the net annual profits accruing from the business of the theater," and each party is to pay one half of the losses of the business, this contract constitutes them partners, notwithstanding that it uses the terms "lessor" and "lessee."

2. SAME—EQUITY JURISDICTION.
One partner may obtain an injunction in equity to restrain his copartner from violating his rights under the contract of partnership, even when the dissolution of the partnership is not asked.

3. CONTRACTS—CONSTRUCTION—ACTS OF PARTIES.
The court will follow, in construing a contract, the construction placed on the contract by the parties themselves; and, where a contract provides that a theater should be operated as "a strictly first-class place of amusement," the court, in order to determine whether there has been a breach of this condition, will take, as a standard of "first-class attractions," one which the parties themselves thought first-class.

4. SAME—PERFORMANCE.
A contract between the lessor and lessee of a theater, in effect, made them partners in the theater business; the lessee, however, to have sole management thereof, and the lessor to have "no control, authority, or voice" therein. *Held*, that it was no breach of the contract, justifying a re-entry by the lessor, that the lessee did not personally attend to the management of the theater building, but was looking after the business elsewhere.

5. SAME—ESTOPPEL.
The lessor could not question the efficiency of the local manager and treasurer, who had immediate charge of the theater, when, having re-entered for alleged breach of the conditions of the lease, he had himself retained them in their positions.

6. SAME.
It was no breach of the contract, justifying a re-entry, that the lessee's employes did not, on one occasion, open the box office for an hour after the advertised time, or that they, on one occasion, without his knowledge, speculated in seats, by selling tickets outside the box office, accounting for them at the price fixed by the manager for that attraction, especially when such employes had been appointed on the recommendation of the lessor, and were also retained by him after his re-entry, with a full knowledge of the facts.

7. ARBITRATION AND AWARD—DECISION.

At common law, all those named as arbitrators must act, and they must all act together, and they must all concur in the award, unless the parties have agreed that it may be made by less than all; and this is the law in Colorado, except in certain cases specified in the Code.

Appeal from the Circuit Court of the United States for the District of Colorado.

In Equity. Suit by Michael B. Leavitt against the Windsor Land & Investment Company, William H. Bush, Frank C. Young, and Edward W. Rollins, for a mandatory injunction restoring complainant to the possession of a certain theater building from which he had been ousted, and for other relief. The circuit court dismissed the bill. Complainant appeals. Reversed.

Statement by CALDWELL, Circuit Judge:

On the 27th day of September, 1889, William H. Bush, in contemplation of the erection by him of a theater building in Denver, Colo., entered into a contract with Michael B. Leavitt whereby the latter acquired the right to the use and occupation of the theater building so to be erected, and the exclusive management, conduct, and control of the theater business therein, for the term of five years from the date of its completion. The building was completed, and possession delivered to Leavitt under the contract, on the 18th day of August, 1890. The provisions of the contract material to the case are as follows:

"And the party of the first part, [Leavitt,] in consideration of the before-mentioned covenants to be performed by the party of the second part, agrees, for himself, his heirs and assigns, to pay to the party of the second part, as rental for the premises hereinbefore described, the sum of eight thousand ($8,000) dollars per year for the first three years of the said term of five years, and the sum of nine thousand ($9,000) dollars per year for the last two years of the said term of five years; and if, as is hereinafter provided, said party of the first part shall continue as lessee of said premises an additional five years, the rental for the said term shall be as the parties may agree hereafter. All rents received under this lease shall be paid monthly, in advance, beginning on the day possession shall be given to the party of the first part, and on the corresponding day of every month thereafter during the continuance of this lease. And the party of the first part, for himself, his heirs, executors, and assigns, does further agree to pay to the party of the second part, his heirs, executors, and assigns, as additional rent for the above-described premises, annually, during the term of this lease, a sum equivalent to one half of the net annual profits accruing from the business of the theater, and a full, complete statement and settlement of such business shall be made each week during the continuance of this lease, and payment shall be made at the same time. It is further covenanted and agreed between the parties hereto that the percentage to be paid to the companies performing at this theater shall be fair and reasonable, and, if possible, no greater than the percentages paid at other first-class theaters in the cities of New York, Chicago, and St. Louis. It is further stipulated and agreed between the parties hereto that the salaries of the manager and treasurer of said theater shall be such reasonable amounts as will be paid to such officers in the cities of New York, Chicago, St. Louis, and San Francisco. * * * Said party of the first part further agrees to pay the sum of three hundred and fifty dollars per month, for each and every month during the continuance of this lease, for electric light and heating; payments to be made to party of second part. The party of the second part, however, agrees to defray all expenses for engine and firemen, fuel, and repairs of steam and electric plants, and the party of the first part to keep the globes and lamps in the theater and entrance in good repair. The party of the first part further agrees to maintain and operate the theater as a strictly first-class place of amusement, and that no attractions shall be booked at the said theater of a questionable character, or such as would not be regarded as first-class by the managers of

the following theaters: The New Broadway or Wallack's, A. M. Palmer's or the Lyceum, of New York; McVicker's, Hooley's Chicago Opera House, or the Columbia Theater, of Chicago; the Olympic or Grand Opera House, of St. Louis. The party of the first part agrees to keep the theater in perfect repair, at his own cost and expense, during the continuance of this lease, and to deliver possession at the termination thereof in as good order as when possession was given to him, ordinary wear and tear incident to theaters, and incidents from fires, storm, or the act of God, only excepted. * * * It is further understood and agreed that the party of the second part shall have no control, authority, or voice in the conduct, management, or affairs of said theater business, but this shall be exclusively under the control of the party of the first part. It is further understood and agreed that, upon the expiration of the five years for which said premises are demised, said party of the second part, his heirs, executors, and assigns, agree that they shall be obliged to give the party of the first part, his heirs, executors, and assigns, the preference and first choice to take a new lease for five years or more, and, until said party of the first part shall decline to take such lease, said party of the second part shall not be at liberty to lease said premises to any other person. And it is hereby agreed that the rental for the second term of five years shall not exceed fifteen thousand dollars per annum rental, and fifty per cent. of the profits of the business. The acceptance or rejection of this second five years shall be made six months prior to the termination of this lease for the five years aforesaid. And it is further agreed that the party of the second part shall have placed at his disposal a private box in said theater, for the use of himself and friends, rent free; the selection to be made by said second party before the said theater is open. And it is further agreed that, should there be any losses in carrying on of the said theater during this lease, that the same shall be borne by the said parties hereto in equal portions, i. e. the said first party, fifty per cent.; and the said second party, fifty per cent. Finally, it is agreed by the parties that, should the party of the first part fail to perform any of the covenants herein required to be by him performed, then this lease shall be null and void, and the party of the first part empowers and authorizes the party of the second part, his heirs or assigns, to re-enter without process of law, and take possession of the premises, and have and hold the same, as though this lease had not been made. In witness whereof, the parties have hereunto set their hands and seals the year and day first above written.

"M. B. Leavitt. [Seal.]
"Wm. H. Bush. [Seal.]"

During the year 1890 the lessor, Bush, sold and conveyed the leased premises to the Windsor Land & Investment Company, which succeeded to all the rights and obligations of the lessor, Bush, under the lease. On April 9, 1891, the appellee, the Windsor Land & Investment Company, by and through its agent, Bush, took forcible possession of the theater building, and excluded the lessee, Leavitt, and his agents, therefrom. Thereupon the original bill in this case was filed in the court below by the lessee, Leavitt, against the Windsor Land & Investment Company and against William H. Bush, Frank C. Young, and Edward W. Rollins, who were in possession of the building, managing and controlling it, as agents of the Windsor Land & Investment Company. The bill set out the contract, averred that the complainant had performed the covenants thereof on his part, and that the defendants had, with force and arms, ejected him from the leased premises, and taken possession thereof, and prayed, specifically, "for a mandatory writ restoring complainant to the possession" of the premises, for an injunction restraining the defendant from interfering with the lessee's possession or the management of the property, and for a specific performance of the contract. The defendants answered the bill, denying that they entered upon the leased premises by force, and alleged that they entered peaceably and lawfully, for breaches of the covenants of the lease on the part of the lessee, for which they were entitled to re-enter by the terms of the lease. Upon the hearing of the motion for an interlocutory injunction the lower court restored the lessee to the possession of the premises, and enjoined the defendants from interfering with such possession. On

June 4, 1891, the defendants filed a cross bill alleging that the lessee Leavitt had forfeited all rights under the lease by violating its terms and conditions in the following particulars: (1) ·That he had devoted a very small portion of his time to the management of the Broadway Theater, but had turned over to his employes almost the entire management and control of the same. (2) That the box office was not kept open at the hours and times it was advertised that it would be open, and when it should have been open. (3) That Leavitt's representatives and agents in the management of the theater refused to sell tickets for popular attractions at the box office, but put them on sale with outside parties at prices much higher than the regular rates, and converted the receipts in excess of the regular rates to their own use. (4) "That the said Leavitt hath utterly and wholly failed to observe and perform that clause of said contract which provides that none but first-class troupes shall be permitted to occupy the said theater, and,· on the contrary, your orators allege the truth to be, in that regard, that many inferior attractions and troupes, and troupes and attractions of a questionable character, have been permitted to occupy the said theater, and to perform thereat, and many troupes and attractions which would not be regarded as first-class by the managers of the theaters designated in the said contract of lease; and your orators state that the following are some of the attractions which have appeared at said theater, which are not first-class, and which would not be so regarded by the managers of said theaters so designated in said contract, to wit: Hearts of Oak, Hubert Wilke, Adelaide Moore, Joseph Grismer, Daniel .Sully, Two Sisters, Kajanka, Hallan & Hart, and the Fakir. That each of said attractions, together with others of a like character, occupied the said theater for a space of one week, and that in contracting for the production of each of said attractions the said Leavitt violated the said contract for the production of only first-class attractions at said theater. And your orators state that they have inspected a list of attractions which it is proposed by the said Leavitt to produce at said theater in the future, and that many of them are not first-class; that many of them are of a questionable character, and that the production of said attractions at said theater will necessarily result in great loss, damage, and injury to your orators, as the owners of the said premises, by reason of the fact; and that the production of attractions of such class and character at said theater will necessarily injure the reputation of said premises as a first-class place of amusement." The cross bill prayed for a cancellation of the lease, and the restoration of the plaintiffs therein to the possession of the leased premises.

Upon the final hearing of the cause, the lower court entered a decree dismissing the original bill for want of equity, and upon the cross bill decreed that the lease be canceled, but that Leavitt, the defendant in the cross bill, should retain possession of the premises, under the ·terms and conditions of the lease, until the 1st day of July, 1893, when he should yield up the possession to the complainants in the cross bill. From this decree, Leavitt, the complainant in the original and the defendant in the cross bill, appealed to this court.

James B. Belford and Alvin Marsh, (George H. Kohn, on the brief,) for appellant.

Charles Hartzell, (J. McD. Patterson, on the brief,) for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

CALDWELL, Circuit Judge, (after stating the facts.) The contract between the parties, in legal effect, is a contract of partnership. By its terms one party contributes to the business of the partnership the use of the theater building, and is to pay certain expenses incident to the use thereof, and the other party contributes his time and skill in the management and conduct of the business, and is to pay a fixed sum per month for lighting and heating the building,

and in addition thereto a fixed sum for rent, and the lessor is to receive, "as additional rent, * * * one half of the net annual profits accruing from the business of the theater," and each party is to pay one half of the losses of the business.   This constitutes them partners.   If the agreement between the parties was a lease, simply, the cause would not, upon the allegations of the original bill, be one of equitable cognizance; for, divested of the element of partnership, it would have been a bill for a summary proceeding in the nature of a forcible entry and detainer, or an action of ejectment, and must have been dismissed upon the ground that the complainant had a plain, speedy, and adequate remedy at law.   But, in view of the partnership relation created by this contract, the jurisdiction of equity to entertain the original bill seems to be clear.   The case of Marble Co. v. Ripley, 10 Wall. 339, 350, is an authority directly in point.   That case shows that the contract in the case at bar is, in the language of Mr. Justice Strong, "in a very practical sense, a contract of partnership."   The case is also an authority for the rule that equity will interfere by injunction to restrain one partner from violating the rights of his copartner, even when the dissolution of the partnership is not contemplated.   The reason for this rule is thus stated by Vice Chancellor Wigram in Fairthorne v. Weston, 3 Hare, 387:

"If that were the rule of the court, if a bill would in no case lie to compel a man to observe the covenants of a partnership deed unless the bill seeks a dissolution of the partnership, it is obvious that a person fraudulently inclined might, of his own mere will and pleasure, compel his copartner to submit to the alternative of dissolving a partnership, or ruin him by a continued violation of the partnership contract."

This doctrine is well settled.   High, Inj. § 1330, and cases cited.

It is not controverted that the defendants in the original bill ejected the complainant's manager and employes, and took possession of the leased premises, if not forcibly, certainly against their will and vehement protest.   The contract gives the lessor the right to re-enter without process of law for a breach of any of its covenants by the lessee; and the material question, and the one upon which the case hinges, is, did the lessee fail to perform any of his covenants contained in the lease, for the breach of which the lessor was entitled to re-enter?   The right to re-enter is rested chiefly on alleged breaches of the following clause of the contract:

"The party of the first part further agrees to maintain and operate the theater as a strictly first-class place of amusement, and that no attractions shall be booked at the said theater of a questionable character, or such as would not be regarded as first-class by the managers of the following theaters: The New Broadway or Wallack's, A. M. Palmer's or the Lyceum, of New York; McVicker's, Hooley's Chicago Opera House, or the Columbia Theater, of Chicago; the Olympic or Grand Opera House of St. Louis."

The proper construction of this clause of the contract is not entirely free from difficulty; but, in the light of the testimony in the case, we have had no difficulty in arriving at a satisfactory conclusion.   We have read the testimony very carefully, and are not satisfied that the complainant did not "maintain and operate the theater as a strictly first-class place of amusement," or that he booked for the theater attractions "of a questionable character," as these phras-

es must have been understood by the parties to the contract. In construing the contract of the parties, regard is to be had to the geographical location of Denver, and the character of the theatrical attractions which it is practicable to procure and produce there, and which are commonly produced there. These are considerations which must have been present in the minds of the parties when they entered into the contract. For illustration, there are what are known as "stock theaters," and "combination theaters." The former produce plays with their own companies the year round. The plays change, but the companies are the same. The stock theaters are confined to the large cities, which are in the center of dense populations and easy of access. The combination theaters play traveling companies entirely. The parties in this contract obviously understood they were contracting with reference to a combination, and not a stock, theater. The theatrical season at Denver is about 40 weeks, and there is a different attraction every week, which involves the employment of at least 40 different theatrical troupes during the season. Usually these troupes have to be engaged months before the time they are to play, and the engagement is most commonly made in New York city. It will be seen at a glance that it is no easy task to secure a season's attractions at a theater in Denver. Experience, energy, taste, and judgment in that line of business are essential to its successful accomplishment. The testimony satisfies us that the complainant displayed a fair degree of all these qualities, and that attractions which he booked for this theater were of a character that might well be booked for a "first-class place of amusement," and were not "of a questionable character," within the meaning of these phrases as they were understood by the parties to this contract. Those terms are probably incapable of any very exact and precise definition, as applied to theatrical attractions. No general definition can be given which would enable every one to classify with precision and unerring accuracy every theatrical attraction. Theatrical managers of experience, and play-goers of intelligence, do not differ much in their general definitions of these terms. The difficulty and difference of opinion begins when they come to classify a long list of attractions. Then the fact is disclosed that an attraction which one manager ranks as first-class in the opinion of another manager falls below that standard. In this matter we think the parties should be bound by the practical construction which they themselves put upon their contract before this litigation began. That the term "first-class attractions," as used in this contract, was not intended by the parties to restrict the attractions to those plays, only, which occupy a high plane in dramatic literature, and are played by artists of the highest repute, and patronized chiefly by people of culture and refinement, is made apparent by the letter of Mr. Bush to the complainant, of date October 12, 1890, in which he says:

"I think you have done a very good thing in securing the 'Clemenceau Case,' Margaret Mather, and Sullivan, [John L. Sullivan, the prize fighter.] While some people may say that the Sullivan attraction is not just the right thing, still I am satisfied that it cannot hurt the house, and it will certainly draw a large amount of money. * * * I believe the 'Clemenceau

Case' attraction will be a tremendous hit. The fact of its having been advertised as it has been in New York will certainly draw tremendous houses for a few nights, pique the curiosity of the vulgar, and even the educated, and you are sure of drawing money out of their pockets."

It is quite clear from the testimony that no attractions were booked for this theater which did not, in point of dramatic excellence and moral tone, equal the attractions which Mr. Bush, in his letter, specially approved and indorsed. Assuming, as we must, that both parties to this contract regarded these attractions as first-class, and not of a questionable character, then it is apparent that no attraction was produced at the Broadway Theater by the complainant which was an infraction of the contract, according to the standard erected by the parties themselves. Mr. Bush is not the only witness who makes the box receipts, and not the moral tone and dramatic excellence of the play, the test of its being a first-class attraction. But, undoubtedly, this test cannot be accepted as the best and only one. An attraction of the highest dramatic excellence may be played at a loss, and one of a highly questionable character at a profit. Plays which unite the highest dramatic excellence with large profits are, in the opinion of theatrical managers, ideal first-class attractions. Yet they all agree that plays which fall below this ideal standard are nevertheless ranked as first-class attractions. But it is said that the contract commits the decision of this question to the managers of certain named theaters. If this is true, in the sense that their determination of the question is to be binding upon the parties and the court, it is because the parties have by their contract constituted them arbitrators for that purpose. Assuming, but not deciding, that this fluctuating body of managers are constituted arbitrators, and that under the contract they are the sole arbiters of this question, then it is very clear the defendants have failed to establish the alleged breach of the covenant by the complainant, upon which the right to re-enter is rested. At common law, all those named as arbitrators must act, and they must all act together, and they must all concur in the award, unless the parties have agreed that it may be made by less than all. The authorities to this effect are uniform in England and in this country. Russ. Arb. 216; Morse, Arb. 151, 162. The defendants have produced no award of the arbitrators, and have not shown, in any mode, a concurrence of opinion among them, that a single attraction produced at the Broadway Theater under the complainant's management was not first-class, or was of a questionable character. The Colorado Code has not made any change in the common-law rule on this subject which affects this case. The Civil Code of that state of 1887 (section 285, p. 180), provides that "any arbitrator may administer oaths to witnesses, and, when there are three arbitrators, two of them may do any act which might be done by all." This clause has no application to the case at bar, because under this contract there must be at least four arbitrators, and may possibly be ten, depending upon the construction placed upon the clause of the contract under consideration.

Whether the contract constitutes the managers of the named theaters arbitrators, or whether the case is to be determined on the

weight of testimony, or upon the practical construction given to the contract by the parties themselves, the result is the same,—the defendants have not shown any breach by the complainant of the covenants we have been considering. We attach no importance to the claim that the complainant did not attend personally to the management of the theater building. It is quite obvious that his time and services in New York and elsewhere were more valuable to the business than they would have been in Denver. Besides, his local manager and treasurer, who had immediate charge of the theater, seem to have been competent persons for the work. It is not open to the defendants to question their competency and efficiency; for, when they re-entered and took charge of the theater, they themselves retained these employes in the same positions they had occupied under the complainant.

The complainant's employes, upon one occasion, did not open the box office for an hour after the usual and advertised time, and this action seems to have been the immediate cause of the re-entry; but it is plain that it did not justify it. The contract expressly provides that the lessor "shall have no control, authority, or voice in the conduct, management, or affairs of said theater business, but this shall be exclusively under the control of the" lessee. Under this clause the complainant had the undoubted right to open the box office at such hours of the day as he deemed best, and a failure to open it on a single morning, at the hour advertised, did not work a forfeiture of the lease, or give the lessor a right to re-enter.

Upon the occasion of the Bernhardt attraction, the complainant's employes, without his knowledge or consent, speculated in the seats by selling tickets, or causing them to be sold, outside of the box office. This was done by employes whose appointment had been recommended by Mr. Bush, and for one of whom he was surety, and both of whom he retained in their positions, with full knowledge of the facts, after his re-entry. The partnership lost nothing by the speculation, because every ticket sold was accounted for at the price fixed by the manager for that attraction. It is needless to say that upon these facts that transaction afforded no ground for re-entry. The conclusion reached upon the original bill makes it unnecessary to consider the cross bill.

The decree of the circuit court is reversed, and the cause remanded, with direction to dismiss the cross bill for want of equity, and to enter a decree on the original bill to the effect that the complainant is entitled to the occupation and possession of the leased premises, under the terms and conditions of the lease, so long as he observes the covenants thereof, and enjoining the defendants from taking possession of the leased premises, or in any manner interfering with the complainant's possession thereof, for any alleged breaches of the covenants of said lease by the complainant which happened prior to the filing of the cross bill in this case.