ILLINOIS TRUST & SAVINGS BANK v. CITY OF ARKANSAS CITY.

HOPPER v. SAME.

(Circuit Court of Appeals, Eighth Circuit. September 14, 1896.)

Nos. 672, 673.

1. MUNICIPAL CORPORATIONS—CONTRACTS WITH WATER COMPANIES.
     A city of the second class under the laws of the state of Kansas has power to contract with a private party for the construction and operation of waterworks, to agree to pay rent for the use of hydrants, and to grant to such a party the use of its streets for the purpose of laying pipes to conduct the water.

2. SAME—EXCLUSIVE RIGHTS.
     Such a city has no power to grant to a private party the exclusive right to use its streets for that purpose.

3. SAME—INVALID IN PART.
     When a divisible part of a contract is ultra vires, but that part is neither malum in se nor malum prohibitum, the remainder of the contract may be enforced, unless it appears from a consideration of the entire agreement that it would not have been made independently of the part which is void.

4. SAME—LIABILITY FOR WATER RENTS.

The invalidity of the exclusive grant by a city of the right to use its streets to conduct water to its inhabitants is no defense to an action for the rents the city promised to pay to the grantee for the use of the hydrants after the works have been constructed according to the contract, and have been accepted by the city.

5. SAME—WHO MAY ALLEGE INVALIDITY.

No one who does not infringe or threaten to infringe the exclusiveness of such a grant can be heard to allege its invalidity, after the works have been constructed, and the contract has been substantially performed by the grantee.

6. SAME—AUTHORITY OF COUNCIL.

The members of the legislative body of a city may not so act or contract as to deprive their successors of the unimpaired exercise of the legislative or governmental powers conferred upon the body for the purpose of ruling the inhabitants of the city.

7. SAME.

But this rule is inapplicable to the exercise of the business or proprietary powers of the municipality, such as the power to contract for waterworks, because such powers are conferred upon the legislative body of a city for the private benefit of its inhabitants and itself as a personality, rather than to enable it to govern its citizens.

8. SAME.

In the exercise of these business powers, a municipality is governed by the same rules as a private corporation or an individual, and it may make contracts for terms longer than the duration of the terms of office of the members of its legislative body.

9. SAME—CONTRACT FOR TERM OF YEARS.

Gen. St. Kan. 1889, par. 7185, grants to cities of the second class in the state of Kansas full power and authority to contract for and procure waterworks to be constructed to supply their inhabitants with water. *Held*, a city of that class was authorized to make a contract for the construction of waterworks, and the lease of hydrants for a term exceeding the duration of the single year during which the members of its city council held office. *Held*, further, the legislature intrusted the determination of the length of the term of such a contract to the discretion of the city council, and, in the absence of evidence of a gross abuse of that discretion, it is not the province of a court to declare such a contract void because its term was 21 years.

10. FEDERAL COURTS—CONSTRUCTION OF STATE STATUTE.

In the construction of the statutes of a state which measure the powers and liabilities of its political organizations the national courts uniformly follow the interpretation of the highest judicial tribunal of the state, where no question of general or commercial law or of right under the constitution or laws of the nation is involved.

11. MUNICIPAL CORPORATIONS—ORDINANCES.

Under paragraph 765, Gen. St. Kan. 1889, an ordinance which does not receive the votes of a majority of the members elect of a city council is defeated.

12. SAME—CONTRACTS BY RESOLUTION.

Where the statutes of a state authorize the legislative body of a municipality to act or contract, and do not require this to be done by ordinance, that body may act or contract by a vote upon a motion or by the passage of a resolution. The statutes of Kansas do not require a city council of a city of the second class to make or authorize a contract for waterworks by ordinance.

13. SAME—ACCEPTANCE OF CONTRACT.

The presentation to the city council of a city in open session by a private party, who is named as grantee in a defeated ordinance upon its records, of a written acceptance of the terms of the ordinance and a bond to construct waterworks accordingly, the construction of the works and the location of the hydrants by such grantee under the direction of the

city council, the actual acceptance and use of the works by the city when completed, and the passage by the city council of a formal resolution that the waterworks erected under the ordinance are accepted by the city, constitute a binding contract between the city and the grantee in the ordinance for the construction and operation of the waterworks according to its terms.

**14.** ESTOPPEL—REPRESENTATIONS.

No one may, to the damage of another, deny the truth of representations by which he has purposely or carelessly induced that other to change his situation.

**15.** SAME—ACQUIESCENCE.

As against the bondholders who loaned their money on a mortgage of the plant and income of waterworks owned by the mortgagor, which had been built under the direction, and accepted by the formal resolution, of the city council of a city, as completed according to the terms of a defeated ordinance, upon its records, and for which the city had paid rental without protest for 14 months according to the terms of this ordinance, such city is estopped to defeat a recovery for the rents subsequently accruing according to the terms of the ordinance, either on the ground that there was no contract, or that the city had no power to contract for 21 years, or that it had no power to grant to the water company the exclusive right to use its streets for laying water pipes.

(Syllabus by the Court.)

Appeals from the Circuit Court of the United States for the District of Kansas.

These are appeals from a decree of foreclosure of a trust deed upon the waterworks in the city of Arkansas City, in the state of Kansas. The Illinois Trust & Savings Bank, the trustee in the deed and the complainant in the foreclosure suit, appeals, because the court below adjudged by its decree that the city of Arkansas City was not bound to pay the rentals for hydrants, which it undertook to pay by the terms of the contract with the mortgagor, under which the works were constructed, and in reliance upon which the money secured by the mortgage was loaned. George E. Hopper, the receiver appointed in the foreclosure suit, appeals, because the court below adjudged by this decree that, although the city had used 179 hydrants under this contract during the receivership, it was bound to pay no rental for more than 50 thereof.

The city of Arkansas City is a city of the second class under the laws of the state of Kansas. On December 28, 1885, that city undertook to pass its Ordinance No. 27, to induce the construction of waterworks in that city, for the purpose of supplying the city and its inhabitants with water for public and domestic purposes. The statutes of the state of Kansas declare that no ordinance of such a city shall be valid unless a majority of the members elect of the city council vote in favor thereof on a call of the yeas and nays, and their vote is entered on the journal by the clerk. Gen. St. Kan. 1889, par. 765. The city council of this city consisted of eight members, but only seven were present when this ordinance was put to a vote, and only four voted in its favor. It was, however, declared adopted; was approved by the mayor; was accepted by the Interstate Gas Company, to which it granted the franchise to construct and operate the waterworks; the works were constructed under its provisions at an expense of thousands of dollars; the $150,000 secured by the trust deed was loaned by the bondholders, now represented by the bank, in reliance upon this ordinance; and the city paid the rentals it promised to pay by it until October, 1891.

The provisions of this ordinance that are material to the issues in this case are these:

By section 1 the Interstate Gas Company, its successors or assigns, are authorized to use the streets of the city to lay pipes for the conveyance of water in and through the city for the use of the city and its inhabitants.

"Sec. 2. That said Interstate Gas Company, its successors or assigns, shall have the exclusive privilege of laying down pipes for conveying water in said

city for the use of said city and inhabitants for the term of twenty-one (21) years from the date of the passage of this ordinance; provided that the Interstate Gas Company, its successors or assigns, shall within sixty (60) days from the approval of this franchise, establish the best and most suitable place within the western portion of this city for the source of water supply, and submit this selection to the mayor and city council for their approval and have the said works completed and in successful operation within eight months of such approval, and shall keep and maintain such system of water works with all future additions and extensions in successful operation thereafter during the term of franchise, unavoidable accidents or delays consistent with ordinary precaution only excepted.

"Sec. 3. That said Interstate Gas Company, its successors or assigns, shall erect within the corporate limits of the city of Arkansas City, Kansas, a complete system of water works of sufficient capacity to furnish at all times all the water necessary for use in said city for the prompt extinguishment of fires and for sprinkling and other public and domestic purposes, and shall at all times make all additions and extensions necessitated by the increased demand.

"Sec. 4. That said Interstate Gas Company, its successors or assigns, shall at the most suitable place erect the necessary buildings and appliances for such system of water works, and shall erect and put up a stand pipe of the dimensions of ten (10) feet diameter and one hundred and fifteen (115) feet high; there shall be two (2) duplex pumps of the most approved pattern capable of furnishing one million gallons of water per day of twenty-four hours, also two boilers of best construction and so arranged and built that they may be fired and used separately or together and each of sufficient power to run both pumps at the same time with easy firing, and provide everything found indispensable and desirable for a complete and successful plant of water supply.

"Sec. 5. Starting from these works the Interstate Gas Company, its successors or assigns, shall lay down and maintain standard iron mains of at least three and one-half (3½) miles in length, said pipe to be of such dimensions as hereinafter set forth, and sufficient to secure at all times and at any and all places within said three and one-half miles of sufficient water supply, as well for public as domestic use, and the said Interstate Gas Company, its successors or assigns, shall erect without cost to the city, fifty (50) double discharge fire hydrants or any number above said amount as may be ordered by the city at such points and places as the proper authorities of the city of Arkansas City may designate and shall connect such fire hydrants with the system of mains, provided that whenever the additional hydrants so ordered shall necessitate an extension of the mains beyond the three and one-half miles the number of hydrants so ordered or the private consumption to be secured or jointly are sufficient to justify the additional outlay.

"Sec. 6. That the size of the mains shall be as follows: Starting out from the works there shall be not less than ten (10) inch pipe extending to Summit street, there shall be seventeen hundred (1700) feet of eight (8) inch pipe laid in Summit street and connecting with the ten inch main; there shall be twenty-two hundred and eighty (2,280) feet of eight (8) inch main, laid as the city council may direct; the balance of the three and one-half miles and any further extensions to be of any size not less than four inches in diameter laid as the city may direct; all pipes to be of the dimensions stated interior measure, and all the mains to be of standard cast iron and no mains to be laid at any time less than four inches interior diameter; the stand pipe to be of boiler iron and to be placed on a solid foundation of masonry laid in cement.

"Sec. 7. That the Interstate Gas Company, its successors or assigns shall at the request of any citizens without unnecessary delay, put down the necessary pipes, and connect them with their system of mains to supply the property of said citizens with water for all domestic purposes under such conditions and at such annual rents as shall be agreed upon between the city council and the Interstate Gas Company before the expiration of the sixty days granted above for the establishing of water source, but the Interstate Gas Company, its successors or assigns, may make with large consumers, such as railroads, hotels, mills, breweries, factories and others, special rates as they may deem proper, the cost of the connections to be borne by the respective citizens.

"Sec. 8. The Gas Company shall repair damages to the streets caused by laying or operating its mains.

"Sec. 9. The city of Arkansas City, by its mayor and city council for and in consideration of the obligations imposed on the Interstate Gas Company its successors or assigns, by the foregoing sections, hereby agree to, and contract with the Interstate Gas Company, its successors or assigns, to accept the fifty (50) hydrants stipulated in section five of this ordinance for the use of the city of Arkansas City as soon as the same are erected, connected with the water mains and supplied with water, and from that day to pay the Interstate Gas Company, its successors or assigns, the sum of sixty dollars ($60) U. S. currency per annum for each and every such fire hydrant above enumerated as well as for every additional hydrant in excess of said number during the term of this contract; * * * provided however that the mayor and the city council of the city of Arkansas City, Kansas, shall not be bound to accept such fifty hydrants for the use of the city before a thorough test is made to prove that the works erected by the Interstate Gas Company, its successors or assigns, under this ordinance are in perfect working order and are able to throw simultaneously four (4) streams of water from any four hydrants to be designated by the mayor and city council through one hundred feet of two and one-half inch rubber hose and one inch ring nozzle at least sixty-five (65) feet high from stand pipe alone and eighty (80) feet high by direct pressure of pumps."

"Sec. 17. That the Interstate Gas Company shall execute a good and sufficient bond in the penal sum of five thousand dollars conditioned for the faithful completion of works as specified in section 2, said bond to be subject to the approval of the mayor and to be void after the acceptance of the works as set forth in section 9."

"Sec. 23. This ordinance shall take effect and be in force from and after its publication once in the Arkansas City Traveler, and its acceptance in writing by the Interstate Gas Company, its successors or assigns."

On February 12, 1886, the gas company, the grantee named in this ordinance, submitted its selection of water supply for the works, pursuant to section 2, to the mayor and council of the city, for their approval, and the council, by vote, approved the selection. At the same time the gas company presented its written acceptance of the ordinance and the bond required by section 17 thereof, and these were received by the council in open session. On September 12, 1886, the gas company offered to extend the waterworks by the addition of 50 extra hydrants, making the whole number of hydrants 100, at one-half the rental named in the original ordinance for two years, and to furnish schoolhouses and city buildings free, and this offer was accepted by vote of the city council. The gas company constructed these waterworks during the summer of 1886, and on September 17th of that year had completed them ready for operation in accordance with the provisions of the ordinance. On January 17, 1887, a committee of the city council made the following report to that body:

"To the Honorable Mayor and City Council, Arkansas City, Kansas—Gentlemen: Your committee on waterworks hereby beg leave to report: That the Interstate Gas Company have finished the system of waterworks contracted for with this city under Ordinance No. 27, to the full satisfaction of your committee, and that the test required under said ordinance was successfully made. The Interstate Gas Company has, in our opinion, carried out its contract faithfully and conscientiously, and the works are acknowledged to be an ornament and a valuable permanent improvement for our city. We therefore beg leave to submit the following resolution, viz.: That the waterworks erected by the Interstate Gas Company under Ordinance No. 27 be, and are hereby, accepted by the city; said acceptance to date from Oct. 1, 1886, the same having been finished and ready for operating since Sept. 17, 1886; and that the Interstate Gas Company, its successors and assigns, be, and are hereby, released from the bond and from all liabilities under such ordinance, as far as the construction of such works is concerned.

"[Signed]                                    C. G. Thompson,
"A. A. Davis, and
"C. T. Thusston."

On the same day the city council adopted the resolution recommended by this report. After the waterworks had been completed and put into operation, the Arkansas City Water Company, a corporation of the state of Kansas, succeeded to all the property, franchises, and rights of the Interstate Gas Company in these waterworks, and thereafter, on November 25, 1887, that company made the trust deed here in suit to the Illinois Trust & Savings Bank, to secure the payment of 150 of its bonds of $1,000 each, dated October 1, 1886, payable October 1, 1906, with interest at 6 per cent. per annum, payable semiannually. By this deed the water company not only conveyed all the real estate, water mains, pipes, franchises, and property pertaining to these waterworks, but it assigned to the bank all its claims and demands that should arise during the existence of any part of the mortgage debt against the city of Arkansas City under Ordinance No. 27, and authorized the bank to collect, receive, and receipt for all sums of money so accruing from the city of Arkansas City for the rent of fire hydrants; and, in case of default in the payment of the semiannual interest upon the bonds for the space of six months, it authorized and empowered the bank, on the usual terms, to declare the whole debt due, and to "take possession of the property and franchises herein mortgaged or covenanted so to be and by itself and agents, or by a receiver of a court appointed in a suit for the enforcement of this lien, or a suit for such possession, hold, use, and operate the same for the equal benefit of the holders of all of the said bonds, and receive the income and profits therefrom." This trust deed also provided that $100,000 in amount of the $150,000 of bonds secured by it should be used forthwith for the retirement of bonds to that amount, which had already been issued by the water company, and that no part of the remaining $50,000 should be issued except to pay for extensions of water mains and betterments connected therewith; to be made by the water company after September 24, 1887, and then only on the certificate of the president and secretary of the water company, satisfactory to the trustee, to the effect that the extensions and betterments had been made, and "that the revenue of the said water company from the city hydrant rental from hydrants on the said extensions amounts to at least enough to pay the interest upon the amount of bonds to be so issued." On Sepember 12, 1887, the water company made a proposition to the city council to "extend the present system of mains four and one-half miles and to erect fifty additional fire hydrants at such prices [points] as may be designated by your waterworks committee, provided the city will agree to pay for said fifty hydrants the sum of thirty dollars per annum each for a term of five years, after which time the rentals shall be and remain sixty dollars per annum as provided in the original franchise. Time of rental to date from time said hydrants are erected and connected with the main and supplied with water as provided in Ordinance No. 27." And the city council accepted the proposition, and ordered the mains laid and the hydrants erected. On November 21, 1887, the city council ordered that the water main be extended on First street to accommodate citizens on that street, and that a hydrant be located at the intersection of First avenue and Third street, provided the waterworks company would furnish the hydrants on the same terms as those last ordered. On May 21, 1888, the city council by vote accepted 54 hydrants erected under the last two orders. About June 1, 1888, the following certificate, signed by the city clerk and sealed with the official seal of the city, was presented to the bank:

"State of Kansas, County of Cowley, City of Arkansas City—ss.: I, J. W. Heck, city clerk in and for said city, hereby certify that fifty-four city hydrants have been erected since September 24, 1887, and put in, in accordance with the order of the city council of said city made on September 12, 1887, and connected with the extensions of water mains of the Arkansas City Water Company, and supplied with water and accepted by the mayor and city council of said city, in accordance with the provisions of section 9 of the original franchise of said company, by a resolution passed May 21, 1888, as follows: 'A motion was offered, seconded, and carried, that the city council accept 54 hydrants under the last order, on conditions that six (6) of the double hydrants be redistributed under the directions of the waterworks committee.' And I hereby further certify that from each of said hydrants said water company is now earning and will receive from the said city of Arkansas

City a rental of $30 per annum, making the total revenue of the said company from the city hydrant rental from hydrants on said extensions, $1,620 per annum. Witness my hand and official seal this 24th day of May, 1888.

[Seal.]                                                   J. W. Heck, City Clerk."

Upon the presentation of this certificate, the bank issued 27 bonds under the provisions of the trust deed to which we have referred, and they were sold by the mortgagor, and are now held by the purchasers or their assignees. Under like resolutions of the council further extensions of the mains were made, 26 more hydrants were erected, and accepted by the city council, and on similar certificates of the city, the remaining 23 bonds were issued by the bank, and sold by the mortgagor in like manner. The whole number of hydrants erected was 180. One was afterwards removed, and 179 hydrants have been in use by the city up to the time of the final hearing in this case. The hydrants on the extensions of the original plant were placed on mains four inches in diameter, laid as the city directed, pursuant to the provisions of section 6 of the ordinance. These hydrants were all located and erected under the direction of the city council. The city clerk testified that "there was a water committee for that purpose, and, as the people came in and asked for water, it was referred to the water committee to look the matter over, and the hydrants would be located upon the direction of the waterworks committee." On August 1, 1891, the city council of Arkansas City by a unanimous vote passed a resolution to support the proposition to purchase of the water company the waterworks and all its rights and franchises "for the sum of $190,000; to take the property as above, subject to the mortgage of $150,000, and issue and deliver $40,000 of 10-year bonds, at 6 per cent., or $40,000 of 30-year bonds at 5 per cent., of $1,000 each, with semiannual interest coupons thereto attached. The waterworks to pay the interest on the mortgage of $150,000 to August 1, 1891, and Arkansas City to pay hydrant rental to same date. Waterworks to receive all moneys to said August 1st, and city to receive all moneys after that date, less operating expenses." The proposition contained other provisions that are not material here. Those we have recited were accepted by the water company, and pursuant thereto it conveyed the property to the city subject to the mortgage to the bank by a warranty deed, dated September 16, 1891, which expressly described and excepted the mortgage of $150,000, evidenced by the trust deed, from the covenant against incumbrances. On the same date, in consideration of the $40,000 paid to it by the city, the water company executed and delivered to the city a written consent that Ordinance No. 27 might be repealed, and that the water company surrendered all "rights in, to, or under said ordinance and said contract to the city of Arkansas City, Kansas." On September 18, 1891, the city council passed Ordinance No. 304, which, by its terms, repealed Ordinance No. 27. The city issued its bonds for $40,000, delivered them to the water company, and took possession of the waterworks under the latter's deed. No rental for any of the hydrants has been paid by the city since October 1, 1891, and the interest on the $150,000 secured by the trust deed has been in default since April 1, 1892. On October 18, 1892, the bank filed a bill in the court below and subsequently made an amendment thereto. The bill and the amendment contained sufficient allegations to entitle the bank to a foreclosure of the trust deed, to the appointment of a receiver, and to a decree that, as against the trustee and the bondholders, the contract to pay rental according to the terms of Ordinance No. 27 is binding upon the city, and that Ordinance No. 304, which attempted to repeal it, is void. In this suit the bank made the Arkansas City Water Company and the city of Arkansas City defendants, and on the application of the complainant George E. Hopper was, on December 12, 1892, appointed receiver of the waterworks, and authorized "to operate said waterworks and property, to receive and collect from the various parties using the water from said works, and to receive and collect from the defendant, the city of Arkansas City, the hydrant rental due from said city for the use of said water." To the bill of the complainant in this case the Arkansas City Water Company interposed no answer. The city answered, and interposed several defenses, which were properly overruled by the court below, and will not be noticed. It interposed three defenses that were ultimately sustained by the decree. **They** were that the original contract between the water company and

the city was void (1) because by it the city attempted to grant to a private corporation an exclusive right to furnish the city and its inhabitants with water; (2) because by it the city attempted to grant to a private corporation the right to furnish the city and its inhabitants with water for 21 years, and to bind the city to pay rental for it for that time; and (3) because the ordinance on which the contract was based was not passed, but was rejected, by the city council. On May 21, 1894, after the case had been heard, and after a decree had been rendered that the trust deed should be foreclosed, that the city should pay to the receiver the rental fixed by Ordinance No. 27 for 50 hydrants from October 1, 1891, until the further order of the court, and that the complainant or the receiver might make further application for the payment of additional hydrant rentals, the receiver made a motion that the court make an additional order that the city pay to the receiver the rental fixed by the ordinance for all hydrants used by the city from the date of his appointment to that time. A large amount of testimony was taken upon this motion relative to the efficiency of the additional hydrants, from which it fairly appears that these hydrants have all been supplied with all the water that will pass through the pipe on which they were located by direction of the city council, but that, owing solely to the size of the pipe and the location of the hydrants, they will not stand the test prescribed by section 9 of the original ordinance as a condition precedent to the acceptance of the 50 hydrants first erected, although on the average they will throw the streams of water about one-half as high as prescribed by that test. The testimony was undisputed that the city had used the water from all these hydrants during all this time, and that the supply was ample for sprinkling and all domestic and public purposes except the extinguishment of fires. Upon this evidence the court below held that the city was not liable to pay anything for the use of the 129 additional hydrants. The court then entered a decree to the effect that the trust deed should be foreclosed, and that the tangible property constituting the waterworks should be sold to pay the mortgage debt; that the city should pay $60 a month rental for each of the 50 original hydrants as long as it continued to use the water from them, but that it was not liable to pay to the receiver any rental for the use of the water from the 129 additional hydrants; that no contract based on Ordinance No. 27 was made between the city and the Interstate Gas Company, and that, if it had been made, it would have been void, because it was beyond the powers of the city, and that the city was not liable to pay for the use of the water from any of the hydrants connected with the waterworks for any longer time than it chose to use the same. This is the decree which these appeals challenge.

L. C. Krauthoff and Charles Blood Smith (W. H. Rossington, with them on the briefs), for appellants.

Joseph W. Ady and J. C. Pollock (J. Mack Love and S. R. Peters, with them on the brief), for the city of Arkansas City, appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The effect of the decree in this case is that the city is not liable to pay the rental promised by it for the use of the waterworks, constructed by a private corporation, and accepted and used by the city for many years under a supposed contract, (1) because the city had no power to vest in the private corporation the exclusive right to the use of its streets for the purpose of laying pipes to conduct water to itself and its inhabitants, (2) because it had no power to grant the right to use its streets for that purpose for the term of 21 years, and (3) because the ordinance which expressed the terms of the supposed contract was not originally passed by the vote of a majority of the members elect of the city council.

May a municipality obtain and accept the use of expensive water-works under a contract by which it covenants to pay annual rentals therefor, and to grant an exclusive privilege to use its streets for that purpose, and escape the performance of all its covenants, because it was beyond its power to make the privilege which it granted exclusive? This is the first question presented in this case. Paragraph 7185 of the General Statutes of Kansas of 1889, which was in force when the contract here in question was made, provided:

"That cities of the first, second and third class of the state of Kansas are hereby granted full power and authority on behalf of such cities respectively to contract for, and procure, water works to be constructed for the purpose of supplying the inhabitants of such cities with water for domestic use, the extinguishment of fires and for manufacturing and for other purposes."

It is settled by repeated decisions of the highest judicial tribunal of the state of Kansas that under this and other sections of the statutes of that state a city of the second class has authority to grant a franchise to a person or a corporation to establish waterworks to furnish the city and its inhabitants with water, to grant the privilege of using its streets to a private corporation for such a purpose, and to agree to pay rental to it for the use of its hydrants. Gen. St. Kan. 1889, pars. 787, 817, 1401, 1402, 7185–7190; Wood v. Waterworks Co., 33 Kan. 590, 7 Pac. 233; Burlington Waterworks Co. v. City of Burlington, 43 Kan. 725, 23 Pac. 1068; Columbus Waterworks Co. v. City of Columbus, 46 Kan. 666, 26 Pac. 1046; Manley v. Emlen, 46 Kan. 655, 27 Pac. 844; Columbus Waterworks Co. v. City of Columbus, 48 Kan. 99, 101, 28 Pac. 1097, 1098. These decisions conclude this question here. When no question of general or commercial law, and no question of right under the constitution and laws of the nation, are involved, the federal courts uniformly follow the construction of the constitution and laws of a state given by its highest judicial tribunal. This rule is adhered to with marked tenacity in the construction of state statutes, which measure the powers and liabilities of political and municipal organizations of a state. Madden v. County of Lancaster, 27 U. S. App. 528, 536, 12 C. C. A. 566, 570, and 65 Fed. 188, 192, and cases cited; Detroit v. Osborne, 135 U. S. 492, 499, 10 Sup. Ct. 1012, 1013.

This city, then, had the power to grant to the gas company the privilege of using its streets for water pipes, and it had power to rent hydrants of that company, when this contract was made. For the purposes of this discussion, we shall concede that it had no power to make the privilege of the gas company to use its streets exclusive, because such a grant tends to create a monopoly. The general rule is that the legislature alone has the power to make exclusive grants of this character, and that this authority does not vest in the municipality, unless it is expressly granted to it by its charter. It will be further conceded that, if a grant of a similar privilege in its streets, not exclusive, had been subsequently made by this city to another corporation, and that corporation was about to proceed to construct another system of waterworks in this city, neither the gas company nor the city itself could maintain a bill to enjoin such proceedings. Since it was beyond the powers of the city to make the grant of

the privilege exclusive, that portion of the grant would not sustain a bill to restrain the violation of its terms. Jackson County Horse R. Co. v. Interstate Rapid Transit Ry. Co., 24 Fed. 306, 310; Omaha Horse Ry. Co. v. Cable Tramway Co., 30 Fed. 324; Saginaw Gaslight Co. v. City of Saginaw, 28 Fed. 529, 540; Long v. City of Duluth, 49 Minn. 280, 51 N. W. 913; Minturn v. Larue, 23 How. 435; Wright v. Nagle, 101 U. S. 791. It was upon the principles we have conceded, and upon the authorities just cited, that the court below seems to have based its conclusion that the exclusiveness of this grant would avoid the entire contract. But these principles and decisions are far from sustaining the position that, after this contract has been substantially performed by the gas company, after the waterworks have been constructed according to its terms, and after the city has accepted and used them for years, and has thus secured the substantial benefits of its grant, it can repudiate all the obligations it had the power to assume, because it assumed one that was beyond its power. The conclusion of Judge Brewer in Jackson County Horse R. Co. v. Interstate Rapid Transit Ry. Co., supra,—a suit to enjoin the railway company from constructing a second street railway in a city,—at page 310, "that so much of the ordinance as purported to give exclusive privileges to the lessor or complainant was beyond the powers vested in the city of Kansas, and therefore void," points to the true solution of the question under consideration. If the gas company stood at the initiation of the execution of this contract defending against its specific performance, on the ground that the city had no power to make its right to use these streets exclusive, that defense might deserve some consideration. But now the gas company has constructed the works. It has executed the contract on its part as far as it has been possible for it to be executed. The exclusiveness of its right to the use of the streets of the city was granted for its sole benefit. If it does not receive this benefit, the city suffers no loss. The only effect upon the city is that it gets the waterworks for a less price than it agreed to pay for them. No reason occurs to us why, under this state of facts, the gas company or its successors may not waive the receipt of the exclusive right, and recover the remainder of the consideration which the city promised to pay it. The grant of this exclusive right was neither immoral nor illegal. It was merely ultra vires. We know of no rule of law nor of morals which relieves the recipient of the substantial benefits of a partially executed contract from the obligation to perform or pay that part of the consideration which he can perform or pay, because the performance of an insignificant portion of it is beyond his powers. On the other hand, the true rule is and ought to be, the converse of that proposition. It is that when a part of a divisible contract is ultra vires, but neither malum in se nor malum prohibitum, the remainder may be enforced, unless it appears from a consideration of the whole contract that it would not have been made independently of the part which is void. Navigation Co. v. Winsor, 20 Wall. 64, 70; Reagan v. Trust Co., 154 U. S. 362, 396, 14 Sup. Ct. 1047, 1053; W. U. Tel. Co. v. Burlington & S. W. Ry. Co., 11 Fed. 1, 4, and cases cited in note at page 12; Saginaw Gaslight Co. v. City of Saginaw, 28 Fed. 529,

**540.** There is no such appearance in this case. There is nothing in this contract, or in the situation of the parties to it when it was made, to indicate that the exclusive character of the right to lay pipes in the streets of this city for the purpose of conveying water constituted a material part of the consideration for the agreement. There is nothing to show that the city of Arkansas City was a large or wealthy city, or that corporations or individuals were crowding forward to compete for the privilege of building its waterworks. Its population did not exceed 15,000, and it was probably much less, for the whole number of votes upon the proposition to buy the waterworks in 1891, five years after this contract was made, was only 292. There is but one reference to this exclusive right in the contract itself, and that consists of the mere word "exclusive" before the word "privilege," in the second section of the ordinance. It does not appear that this contract would not have been made and performed, just as it has been, if this word, or the section in which it stands, had been omitted from the ordinance. On the other hand, the size and character of the city, the situation of the parties at the time the agreement was made, and the contract itself all point unmistakably to the opposite conclusion. The result is that the fact that this city undertook to grant to the gas company an exclusive right to conduct water in pipes through its streets does not avoid the entire contract, and constitutes no defense to a claim for a recovery upon the other covenants made by the city, after it has received and accepted from the gas company the benefits of the substantial performance of the contract.

Moreover, the city is in no position in this case to insist upon the invalidity of the exclusive character of this grant, if that could avoid its entire contract. The city is not endeavoring to construct waterworks or to lay pipes in its streets in violation of its exclusive grant to the gas company, nor is any one attempting to do so under its license or by its permission. No one seeks to infringe this exclusive grant. In practical effect it stands unchallenged, and may ever continue to be so. Until it is challenged by the act or endeavor of some one who seeks to infringe it, its validity or invalidity is a moot question, on account of which the courts ought not to, and will not, avoid any part of the contract. No one who does not infringe or threaten to infringe the exclusiveness of the grant in a contract made by a municipality can, after the substantial performance of the contract by the grantee, be heard to say that the contract or the grant is void on account of the exclusive character of the latter. Columbus Waterworks Co. v. City of Columbus, 48 Kan. 99, 112, 28 Pac. 1097, 1102; Dodge v. City of Council Bluffs, 57 Iowa, 560, 566, 10 N. W. 886, 888; Bellevue Water Co. v. City of Bellevue (Idaho) 35 Pac. 693, 695; East St. Louis v. East St. Louis Gaslight & Coke Co., 98 Ill. 415; Decatur Gaslight & Coke Co. v. City of Decatur, 24 Ill. App. 544, 547; Santa Ana Water Co. v. Town of San Buenaventura, 56 Fed. 339, 347; Grant v. City of Davenport, 36 Iowa, 396, 406.

But it is insisted that this contract is beyond the powers of this city, and void, because it grants the right to use the streets of the city to the water company, and promises to pay rental for the hydrants,

for 21 years. The proposition on which this contention rests is that the members of the city council are trustees for the public; that they exercise legislative powers; and that they can make no grant and conclude no contract which will bind the city beyond the terms of their offices, because such action would circumscribe the legislative powers of their successors, and deprive them of the right to their unrestricted exercise as the exigencies of the times might demand. There are two reasons why this proposition cannot be successfully maintained in this case:

First, it ignores the settled distinction between the governmental, or public, and the proprietary, or business, powers of a municipality, and erroneously seeks to apply to the exercise of the latter a rule which is only applicable to the exercise of the former. A city has two classes of powers,—the one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other, proprietary, quasi private, conferred upon it, not for the purpose of governing its people, but for the private advantage of the inhabitants of the city and of the city itself as a legal personality. In the exercise of the powers of the former class it is governed by the rule here invoked. In their exercise it is ruling its people and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants, and it may exercise the business powers conferred upon it in the same way, and in their exercise it is to be governed by the same rules that govern a private individual or corporation. Dill. Mun. Corp. (3d Ed.) § 66, and cases cited in the note; Safety Insulated Wire & Cable Co. v. City of Baltimore, 13 C. C. A. 375, 377, 378, 66 Fed. 140, 143, 144; San Francisco Gas Co. v. City of San Francisco, 9 Cal. 453, 468, 469; Com. v. City of Philadelphia, 132 Pa. St. 288, 19 Atl. 136; New Orleans Gaslight Co. v. City of New Orleans, 42 La. Ann. 188, 192, 7 South. 559, 560; Tacoma Hotel Co. v. Tacoma Light & Water Co., 3 Wash. St. 316, 325, 28 Pac. 516, 519; Wagner v. City of Rock Island, 146 Ill. 139, 154, 155, 34 N. E. 545, 548, 549; City of Vincennes v. Citizens' Gaslight Co., 132 Ind. 114, 126, 31 N. E. 573, 577; City of Indianapolis v. Indianapolis Gaslight & Coke Co., 66 Ind. 396, 403; Read v. Atlantic City, 49 N. J. Law, 558, 562, 9 Atl. 759. In contracting for waterworks to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such a contract is not to govern its inhabitants, but to obtain a private benefit for the city itself and its denizens. 1 Dill. Mun. Corp. § 27; City of Cincinnati v. Cameron, 33 Ohio St. 336, 367; Safety Insulated Wire & Cable Co. v. City of Baltimore, supra, and cases cited under it.

Second. The powers granted to this city by the legislature of the state of Kansas to contract for and procure waterworks are plenary and unlimited save by the duty to exercise them with reasonable discretion, and it is not the province of a court to contract or clip the legislative grant. The words of that grant are, "full power and au-

thority to contract for and procure waterworks to be constructed for the purpose of supplying the inhabitants of such cities with water." It cannot but be clear to all who are familiar with the condition of cities of the second class—cities whose population was between 2,000 and 15,000—in the state of Kansas, in 1872, when this grant was made, that it was not the intention of the legislature of that state to limit the terms of these contracts to the single year during which the terms of office of the members of the city councils continued.   The cities were young and poor, but they were ambitious and sanguine. They did not have the ready money to construct the waterworks which the health and comfort of their inhabitants required.   It is hardly possible that any individual or corporation could have been induced to expend the thousands of dollars required to construct such works as have been built in this city in consideration of the right to use the streets of the city for that purpose, and of the promise of rental for its hydrants for the limited term of a single year.   These facts the members of the legislature must have known, and they undoubtedly granted this plenary power to contract for the very purpose of enabling the cities to procure a supply of water for their inhabitants by grants of privileges to private parties to use their streets for that purpose for a reasonable term of years, and by covenants to pay rentals for hydrants for a like term.   In any event, the legislature made this grant, and it thereby vested in the mayor and council of the city the right to make such contracts for such terms as, in their discretion, they thought proper.   There is nothing in this record to show that the mayor and city council of Arkansas City either exceeded their authority or abused the discretion which the legislature gave them when they fixed the term of the contract in this case at 21 years.   Ample power was granted to cities of the second class of the state of Kansas by section 7185, Gen. St. Kan. 1889, to grant the right to the use of their streets to lay water pipes and to pay hydrant rentals for reasonable terms longer than the year during which their mayors and councilmen held their offices, and there is nothing in this record to show that 21 years was an unreasonable time for the term of such a contract.   Wood v. Waterworks Co., 33 Kan. 590, 597, 7 Pac. 233, 238;  Burlington Waterworks Co. v. City of Burlington, 43 Kan. 725, 728, 23 Pac. 1068, 1069;  Manley v. Emlen, 46 Kan. 655, 27 Pac. 844;  Columbus Waterworks Co. v. City of Columbus, 46 Kan. 666, 26 Pac. 1046;  Columbus Waterworks Co. v. City of Columbus, 48 Kan. 99, 113, 28 Pac. 1097, 1102;  Atlantic City Waterworks Co. v. Atlantic City, 48 N. J. Law, 378, 6 Atl. 24;  Fergus Falls Water Co. v. City of Fergus Falls, 65 Fed. 586, 591;  Long v. City of Duluth, 49 Minn. 280, 51 N. W. 913;  Walla Walla Water Co. v. City of Walla Walla, 60 Fed. 957, 960;  City of Indianapolis v. Indianapolis Gaslight & Coke Co., 66 Ind. 396, 407;  City of Vincennes v. Citizens' Gaslight Co., 132 Ind. 114, 124, 125, 31 N. E. 573.

If, upon general principles, there was any doubt that the defenses of ultra vires, which have been considered, could not be maintained in this suit, the repeated decisions of the highest judicial tribunal of the state of Kansas upon these questions would compel that conclu-

sion. In Burlington Waterworks Co. v. City of Burlington, supra, the city of Burlington had granted to the waterworks company the right to use its streets for 20 years, but had reserved the right to buy the works at an appraised value at the end of each five years, and had agreed to pay rental for a certain number of hydrants meanwhile. The supreme court of Kansas said:

"In our opinion, cities of the second class have the right and the power to provide for supplying themselves and the inhabitants of such cities with water in the manner in which such right and power were exercised in the present case, and in various other ways." 43 Kan. 728, 23 Pac. 1009.

In Manley v. Emlen, supra, the city of Atchison had made a contract in 1880 with one Watts, by which it granted to him the right to use its streets for the purpose of conducting water through them in pipes for 25 years, and had promised to pay rental for certain hydrants during that time. In 1887 the city levied a tax to pay these rentals, and one Manley brought a suit to enjoin its collection. The supreme court of Kansas said:

"In 1880, when the city of Atchison, which was then a city of the second class, provided by ordinance for giving to Sylvester Watts, and to his successors and assigns, the right to furnish water to the city of Atchison and to its inhabitants for compensation, and upon certain terms and conditions, the city certainly had the power to do so, and to make a valid contract with Watts for that purpose."

In Columbus Waterworks Co. v. City of Columbus, 46 Kan. 666, 667, 678, 26 Pac. 1046, 1047, 1050, the city of Columbus made a contract in 1886 with Long and Doubleday and their assigns, the waterworks company, by which it granted to them the exclusive right to construct and maintain waterworks in that city for 99 years, and promised to pay them $60 a year for the use of each of at least 50 hydrants for the term of 21 years. The waterworks were built and accepted under this contract, and the city levied taxes for and paid the rental for the years 1888, 1889, and 1890, but refused to levy any taxes or to pay the rental for the year 1891. The waterworks company applied for a mandamus to compel the city to levy the necessary taxes to pay this rental, and the supreme court sustained its petition, and ordered the mandamus to issue. In Columbus Waterworks Co. v. City of Columbus, 48 Kan. 99, 28 Pac. 1097, the same waterworks company applied to the court to compel the same city to levy the necessary taxes, to pay the hydrant rental under the same contract for the year 1892, and the city answered that it had refused to receive or use any of the water from these hydrants after August 15, 1891. But the supreme court nevertheless issued the mandamus, and compelled the levy of the tax and the payment of the rental. These decisions conclude the discussion of these questions. Madden v. County of Lancaster, 27 U. S. App. 528, 536, 12 C. C. A. 566, 570, and 65 Fed. 188, 192, and cases cited.

Another objection to the validity of this contract is that Ordinance No. 27, which contains the terms of the agreement, was never passed, but was, in fact, defeated, by the city council of Arkansas City, be-

cause that ordinance did not receive a majority of the votes of the members-elect of the council. Let it be conceded that the ordinance did not pass, and that it was defeated when it was presented to the council for action on December 28, 1885. Gen. St. Kan. § 765. Does this fact establish the proposition that this ordinance does not express the terms of a contract made between these parties? The ordinance was approved by the mayor, it was spread upon the records of the city council, and it was treated as evidence of the contract between the city and the gas company until after the waterworks had been constructed and accepted, until after the mortgage of $150,000 had been placed upon it, and until after the city had paid rentals for the hydrants under it for more than four years. The ordinance provided (section 17) that the Interstate Gas Company should give a bond for the faithful completion of the works, as specified in section 2, and that it should take effect on its publication and acceptance in writing by the gas company (section 23). On February 12, 1886, the gas company presented to the city council, and that body received in open session, its written acceptance of the ordinance, and its bond for the faithful completion of the work. On the same day the city council approved the selection of the water supply made by the gas company, and during the construction of the waterworks its committee located the various hydrants upon the mains. The gas company built and put the waterworks into operation, and on January 17, 1887, that body passed this resolution:

"That the waterworks erected by the Interstate Gas Company under Ordinance No. 27 be, and are hereby, accepted by the city; said acceptance to date from Oct. 1, 1886, the same having been finished and ready for operation since Sept. 17, 1886; and that the Interstate Gas Company, its successors and assigns, be, and are hereby, released from the bond, and from all liabilities under such ordinance, as far as the construction of such works is concerned."

Was there no contract here? A proposition made by one contracting party and accepted by the other constitutes a contract. It evidences the meeting of their minds upon the terms of their agreement, and binds them both. If Ordinance No. 27 had been duly passed, it would have been nothing more than an offer by the city to make the grant and contract upon the terms set forth therein. If, after its passage, it had been accepted and acted upon by the gas company, it would have become an irrevocable contract. City of Chicago v. Sheldon, 9 Wall. 50; City of New Orleans v. Great Southern Telephone & Telegraph Co., 40 La. Ann. 41, 3 South. 533; Com. v. Proprietors of New Bedford Bridge, 2 Gray, 339; City of Kansas v. Corrigan, 86 Mo. 67. It can make no difference in the legal effect of such an acceptance whether the one party or the other makes the offer. If the gas company had offered to enter into a contract with the city on the terms contained in the ordinance, and the city had accepted and acted upon that proposition, the contract would have been as binding and irrevocable. But that was exactly what these parties did. The ordinance stood spread upon the records of the council, but it had never been passed by that body. On February 12, 1887, the gas company filed with the council, and that body received in open session, its written acceptance of the terms of the contract

set forth in the defeated ordinance, and its bond to complete the waterworks as provided therein. That acceptance and bond constituted as perfect an offer on the part of the gas company to enter into a contract on the terms of that ordinance as it could have made. On January 17, 1887, the city council resolved, "That the waterworks erected by the Interstate Gas Company under Ordinance No. 27 be, and hereby are, accepted by the city." That resolution, and the actual acceptance and use of the works by the city, was as perfect and complete an acceptance of this proposition of the gas company as it was possible for the city to have made. It was conclusive evidence that the minds of the parties had met upon the terms of a contract set forth in the ordinance, and from that time forth, if not before, the contract became complete and irrevocable. There is no escape from this conclusion on the ground that the city could offer and accept this contract by ordinance only. The legislature granted to the city full power and authority to contract for the construction of these waterworks, and it nowhere prescribed the mode by which the city should authorize or make the contract. It is common learning that where a statute authorizes action by the legislative body of a city, and does not require such action to be taken by ordinance, it may be taken by a vote upon a motion or by the passage of a resolution. Smalley v. Yates, 36 Kan. 519, 524, 13 Pac. 845, 848; Board v. De Kay, 148 U. S. 591, 595, 598, 599, 13 Sup. Ct. 706, 708, 709; Brady v. City of Bayonne (N. J. Sup.) 30 Atl. 968; Courter v. Board, 54 N. J. Law, 325, 329, 23 Atl. 949, 950; City of Green Bay v. Brauns, 50 Wis. 204, 207, 6 N. W. 503, 504; 1 Dill. Mun. Corp. (4th Ed.) § 307, and notes; State v. Jersey City, 27 N. J. Law, 493; Butler v. Passaic, 44 N. J. Law, 171; Merchants' Union Barb-Wire Co. v. Chicago, B. & Q. Ry. Co., 70 Iowa, 105, 108, 28 N. W. 494, 495; Sower v. City of Philadelphia, 35 Pa. St. 231; San Francisco Gas Co. v. City of San Francisco, 6 Cal. 190; First Municipality v. Cutting, 4 La. Ann. 335; City of Crawfordsville v. Braden, 130 Ind. 149, 28 N. E. 849; McGavock v. City of Omaha, 40 Neb. 64, 82, 58 N. W. 543, 549; Arkadelphia Lumber Co. v. Arkadelphia, 56 Ark. 370, 372, 19 S. W. 1053, 1054; State v. Barbour, 53 Conn. 76, 22 Atl. 686; Nicoll v. Sands, 131 N. Y. 19, 23, 29 N. E. 818, 819; State v. Henderson, 38 Ohio St. 644; Green v. City of Cape May, 41 N. J. Law, 45, 47, 48. There is nothing in Newman v. City of Emporia, 32 Kan. 456, 4 Pac. 815, in conflict with this rule. That case simply held that where a charter requires certain acts to be done by ordinance, they cannot be done by resolution. Board v. De Kay, 148 U. S. 591, 598, 599, 13 Sup. Ct. 706, 709, 710. Nor is there any restriction upon the action of the city council of Arkansas City in entering into this contract in the proviso to section 799 of General Statutes of Kansas, 1889. Carleton v. City of Washington, 38 Kan. 726, 17 Pac. 656. The result is that the city of Arkansas City made an irrevocable contract with the Interstate Gas Company, the terms of which are evidenced by Ordinance No. 27, and that none of the provisions of that contract which are in question in this suit are invalid on the ground that the city exceeded its powers in making the contract.

A single question remains. Is the city liable to pay to the receiver any rental for the use of the 129 hydrants located upon the mains of the waterworks and their extensions after September 1, 1886, under the orders of its council? The bank, the complainant in this suit, insists that the court below erred in considering this question at all in this suit upon the application of the receiver without pleadings, and that its findings and decree in this regard should be reversed on this ground. The majority of the court are of the opinion that the court acted rightly in not allowing a recovery in this suit for any of the extra hydrant rentals, and that the question of the liability of the city for such hydrant rentals should be left to be determined hereafter unaffected by any of the proceedings in this suit, if any person shall hereafter demand against the city a right to such rentals. The writer of this opinion is unable to concur in that view, nor do the majority of the court concur with him in the views expressed in the remainder of this opinion. It seems to him that the contention of the bank that the court erred in considering and determining this question at all without pleadings, on a mere motion of the receiver for an order of the court directing the city to pay the rentals should not now be sustained. It is made for the first time in this court. The course of proceedings in the court below was this: On the motion of the bank that court had rendered a decree which provided that the city should pay to the receiver the rental fixed by the contract on the 50 hydrants ordered by the original ordinance, and that the bank and the receiver might apply to the court for orders for the payment of the rental of the additional hydrants. Under this decree the receiver made an application for such an order by motion. No objection was made to this method of presenting the question. A large amount of testimony was taken, a full hearing was had upon the application, and the court decided it upon its merits. It is true that the record does not, in terms, state that the bank appeared at this hearing, but it does show that the receiver was appointed on its application; that the attorneys of the bank were the attorneys of the receiver; that, as such attorneys, they conducted the examination of the witnesses upon this hearing, and that no objection was interposed by them, or by any of the parties to this suit, to the disposition of this matter made by the court, either because no pleadings had been filed, or on any other ground whatever. The court below would undoubtedly have required pleadings and the framing of issues here, if any party in interest had requested it. The record conclusively shows that no one was surprised upon the trial of this issue by the lack of pleadings, that the attorneys and the parties who participated in it perfectly understood the issues, and that the receiver and the city tried the question in dispute out upon the merits, and obtained its decision. The complainant, whose attorneys, as representatives of the receiver, made the motion for this hearing, and pressed it to a decision, was bound to take notice of these proceedings, and to place its objection to them, if it had any, before the trial court. It could not lie dormant until that court had investigated and decided the issue, and then adopt the decision, if favorable, and repudiate it, if fatal, to its claim. It is

now too late for it to present this objection for the first time in this court. Moreover, the question decided by the court below was germane to the issue in this suit, and its decision was necessary to a full determination of the rights of the parties to the suit in the subject-matter of the action. The mortgage provided that, in case of default, the trustee, by itself or a receiver appointed by the court, should take possession of the waterworks, operate them, and collect the income thereof. The bill prayed that the receiver should have power to collect of the city the rentals due under Ordinance No. 27. The order appointing the receiver directed him to collect all hydrant rentals due from the city for the use of the water. The question as to the amount of these rentals due arose between the defendant city and the receiver. Perhaps the latter might have brought an action against the defendant to recover these rents, but the necessary parties to such an action were already in the court below, and another suit to determine that question was certainly unnecessary. Possibly, the defendant city might have objected to this method of treating this question, but it did not do so. It consented to its trial by the court below, and now demands its decision here upon the merits. The receiver and the defendant very properly tried the dispute upon its merits before the court, which already had jurisdiction of the subject-matter and of the parties, and that court heard and decided it. The settled rule in equity is that, "having properly acquired jurisdiction over the subject-matter for a necessary purpose, it was the duty of the court to proceed and do final and complete justice between the parties, where it could as well be done in this court as by proceedings at law." Tayloe v. Insurance Co., 9 How. 390, 404.

I turn to the merits of the question. The city of Arkansas City made a contract with the Interstate Gas Company for the lease of hydrants from the system of waterworks to be constructed by the latter company. The gas company agreed to erect the necessary works, to lay $3\frac{1}{2}$ miles of water pipes of specified dimensions, and to connect 50 hydrants therewith, or any number above that amount that should be ordered by the city council, and to place them wherever the city should direct, "provided, that whenever the additional hydrants so ordered shall necessitate an extension of the mains beyond three and one-half miles, the number of hydrants so ordered or the private consumption to be secured or jointly are sufficient to justify the additional outlay." Sections 2, 5. The contract provided that the water pipes on the extensions beyond the $3\frac{1}{2}$ miles should "be of any size not less than four inches in diameter, laid as the city may direct." Section 6. The city agreed by the contract to pay the sum of $60 per annum for each of the first 50 hydrants to be erected, "as well as for every additional hydrant in excess of said number during the term of this contract." Section 9. From time to time, after the original works were erected, the city ordered these works extended, and directed additional hydrants to be erected, or duly accepted offers to extend the works, and to erect additional hydrants made by the gas company, or by its successor, the water company, until there were about 13 miles of pipes and 179 hydrants in the system. The extensions were made with pipes four inches in

diameter and each of the additional 129 hydrants was located and erected by the order of, and under the direction of, the city council, and every one of them was duly accepted and used by the city.   Some of the orders for these additional hydrants provided that the city would pay but $30 per annum rent for the first three or five years of their service, and the city paid rent for each of them from the time of their acceptance until the first day of October, 1891.   Since that day it has continued to use the hydrants as before, but it refused to pay any rent for them on the ground that they were not efficient in extinguishing fires.   The evidence on which this claim is based conclusively shows that, if they were not efficient, it was not because the waterworks were not maintained in as efficient a condition as when these hydrants were accepted, but it was solely because the mains on the extensions were too small, and the hydrants were badly located. The city is driven by this evidence to this position:   To defend against its liability for these rents, it must maintain that if, on account of the size of the mains and the improper location of the hydrants, they cannot stand the test prescribed by section 9 of the ordinance, as the condition precedent to the acceptance of the original plant and the first 50 hydrants, the city is under no obligation to pay for their use. The evidence was, in effect, that streams of water could be thrown from these hydrants to only about half the height required of the first 50 hydrants by section 9, and upon this ground the court below held that the city was not liable to pay for the use of the additional hydrants.   Is this the legal effect of this contract?   Could this city order the extension of these 4-inch mains of the water company, 9½ miles, and the erection of 129 additional hydrants, under the contract evidenced by Ordinance No. 27, accept them all as sufficient and efficient, and, after acquiring the benefit of the extension, and paying rent for the hydrants two or three years, continue to use them without any liability to pay for their use?   It is undoubtedly true that if, after the construction and acceptance of the extension and the additional hydrants, they deteriorated in value or usefulness, the damage sustained from that fact might be offset against the rental, and, if they became utterly useless, the damage would be more than if the deterioration was small.   But, even in such an event, the city could hardly entirely offset the rental by damage, as long as the extensions supplied sufficient water to the inhabitants for domestic and sprinkling purposes.   In such a case, as the city would have obtained the benefits of a substantial performance of the contract, it could not make an absolute defense against the payment of the rental.   The complainant would be entitled to its rental less the damage sustained by the failure of the water company to completely perform the contract.   German Sav. Inst. v. De La Vergne Refrigerating Mach. Co., 17 C. C. A. 34, 37, 70 Fed. 146, 150, and cases cited; Wiley v. Inhabitants of Athol, 150 Mass. 426, 435, 23 N. E. 311, 316, and cases cited. But this question does not arise in this case.   The testimony is undisputed that the hydrants are as efficient and the extensions are as sufficient as they were when the city accepted them, and that their inefficiency results from the fact that the pipe used for the extensions was too small to supply the large number of hydrants located upon

them under the direction of the city, and that some of the hydrants were located on dead ends of the mains, where it is impossible to drive a forceful stream through them. Now, how can this fact relieve the city from liability for the rent when it was the city itself that directed the laying of the four-inch pipe, located the hydrants upon it, accepted the hydrants as sufficient, and obtained the use of most of them for some years at half price?

There is another consideration that must not be overlooked in construing this contract. It is not contended that the extensions and hydrants are not sufficient to furnish all the water required for sprinkling and all domestic purposes and for all public purposes except the extinguishment of fires. Now, the extinguishment of fires in a city is not usually the main inducement for, or the chief benefit of, a system of waterworks. Such a system conduces to the health, comfort, and pleasure of the inhabitants of a city a thousand times where it extinguishes a fire once. I venture to say that it was not so much the need of water to extinguish fires on the streets along this 9½ miles of extensions as it was the want of water by the residents upon those streets for domestic purposes that induced the city council to order them. Nor can there be much doubt that they never would have been laid without the contract of the city to pay rental upon these additional hydrants. There are generally many streets in a small city where the private consumption of the water will not warrant the necessary expense of extending the mains, and yet the health and comfort of the inhabitants compel the city to make the extension. In such cases it became necessary for the city under this contract to locate and pay for such a number of hydrants as would yield to the water company a sufficient revenue to warrant the expenditure, even though the hydrants were unnecessary for the extinguishment of fires. That this course might be, and probably would be, pursued, was evidently contemplated by the parties to this contract, for it provided, by section 5 of the ordinance, that, in case extensions were directed, the number of hydrants ordered, or the private consumption, or both, should be sufficient to justify the expense. A careful reading of all the testimony in this case points unmistakably to the conclusion that the real objection to the payment of the rental for these hydrants is that the city now finds that it ordered more hydrants than it is now willing to pay for. But it made its own bargain, and it is no defense to its enforcement that it bought too much, or promised to pay too high a price for its lease.

Bearing in mind now how important a part of the consideration for this rental the supply of water for domestic purposes for the residents along these extensions must have been, and the fact that the supply for those purposes was ample, that the extensions and additional hydrants are as efficient for the extinguishment of fires as they were when the hydrants were accepted, and that the only reason they are not more efficient is because the extensions were made with pipe that was too small and the hydrants were improperly located, under the direction and with the approval of the city itself, let us inquire what provision of this contract required the water company to maintain a higher degree of efficiency, or relieved the city from paying for the

water it used from these additional hydrants. On this subject the contract provides that the gas company is given the exclusive privilege of laying its pipes in the city to conduct water on condition that it maintains its works and additions in successful operation (section 2); that it shall erect a complete system of waterworks of sufficient capacity to furnish at all times all the water necessary for use in said city for the prompt extinguishment of fires and for sprinkling and other public and domestic purposes (section 3); that it shall lay 3½ miles of pipe of the dimensions specified in the ordinance, sufficient to secure at all places within said 3½ miles a sufficient water supply, as well for public as domestic use, and shall erect 50 hydrants thereon, and as many more as may be ordered by the city under certain restrictions, and shall place them where the city authorities direct (section 5); that the pipe used on the extensions may be of any size not less than four inches in diameter (section 6); that for 21 years the city will pay the sum of $60 per annum for each of the 50 hydrants required to be placed on the original system "as well as for every additional hydrant in excess of said number during the term of this contract: * * * provided, however, that the mayor and city council of Arkansas City, Kansas, shall not be bound to accept such fifty hydrants for the use of the city before a thorough test is made to prove that the works erected by the Interstate Gas Company, its successors or assigns, under this ordinance, are in perfect working order and are able to throw simultaneously four (4) streams of water from any four hydrants to be designated by the mayor and city council through one hundred feet of two and one-half inch rubber hose and one-inch ring nozzle at least sixty-five (65) feet high from stand pipe alone and eighty (80) feet high by direct pressure of pumps." These are all the provisions of the contract upon this subject. They have all been substantially performed, except that the additional hydrants will not stand the test prescribed in the proviso just quoted. But there is nothing in that proviso, or elsewhere in the contract, which makes the compliance with that test a condition precedent to the acceptance of, or the payment of the rental for, the additional hydrants. On the other hand, the proviso expressly restricts this test to the first 50 hydrants, and by its very terms excludes all others from it. Moreover, it reads that the city "shall not be bound to accept such fifty hydrants," and, even if it covered the additional hydrants, their acceptance by the city would have waived this proviso. It provided only that the city was not bound to accept them unless they complied with the test. But the city did accept them, and that was an end of the matter, and the liability for the rent accrued. It seems clear, however, upon a view of the entire contract, that this proviso had no reference to the additional hydrants. This conclusion is forced upon the mind by the fact that the proviso is expressly limited by its terms to the original 50 hydrants, by the fact that it is practically impossible to extend such a system of waterworks, as that here in question, 9½ miles, with mains only 4 inches in diameter, and with as many large hydrants upon them as were ordered in this case, and then to maintain throughout the efficiency prescribed in this proviso, by the fact that the city

obtained the use of many of these hydrants from three to five years for one-half the rental of the original 50, and a lower price imports less efficiency, and by the fact that the city ordered the extensions so made and accepted the hydrants so constructed, although they never were more nearly able to comply with the test than they now are. The last consideration alone ought to be conclusive of this question. These parties construed this contract themselves before any controversy arose over it. One party constructed, and the other accepted, under the contract, pipes and hydrants, which could not stand the test of section 9 of the ordinance. They thereby themselves held that such test had no relevancy to the extended pipes and additional hydrants, and their view was undoubtedly right. "In an executory contract, and where its execution necessarily involves a practical construction, if the minds of both parties concur, there can be no great danger in the adoption of it by the court as the true one." City of Chicago v. Sheldon, 9 Wall. 50, 54; Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057, 1062; Leavitt v. Investment Co., 12 U. S. App. 193, 4 C. C. A. 425, and 54 Fed. 439, 444.

What, then, was the effect of the acceptance by the city of the extensions and additions to these works and its use of the hydrants since 1887 or 1888, upon its defense to these rentals that the size of the pipe ordered to be laid by it was too small, and that the hydrants located by it were improperly placed? It was absolutely fatal to any such defense. The faults in the construction of these extensions and hydrants were patent. They were apparently due as much to the action of the city as to that of the water company. The acceptance and use for years without protest of a building, a system of buildings, or a plant, under a contract for its construction and lease, is a complete waiver of all patent defects in the location or construction thereof. In National Waterworks Co. v. Kansas City, 10 C. C. A. 653, 666, 62 Fed. 853, 866, Mr. Justice Brewer, speaking for this court, said of a claim by the city for damages in that case on account of the inefficiency of the waterworks furnished by the lessor:

"It [the city] has for many years recognized and accepted this waterworks system as having been constructed in full compliance with the demands of the contract, and it is now too late to repudiate such recognition."

In Burlington Waterworks Co. v. City of Burlington, 43 Kan. 725, 23 Pac. 1068, the supreme court of that state held that the city could not defend against an action for the rental of waterworks on the ground that the water was not good, after it had accepted the works and the water had been used by the city and its inhabitants for about a year without protest. In Comstock v. Sanger, 51 Mich. 497, 502, 16 N. W. 872, 875, the supreme court of that state said of a defense to an action for the price of lumber, that the contracted quantity of the special sizes had not been delivered. "Any difference between what they had a right to demand and what they had actually received was waived by the reception without protest. This is a rule of justice as well as of law. Parker v. Palmer, 4 Barn. & Ald. 387; Chapman v. Morton, 11 Mees. & W. 534; Reed v. Randall, 29 N. Y. 358; Manufacturing Co. v. Allen, 53 N. Y. 515; Barton v.

Kane, 17 Wis. 37; Watkins v. Paine, 57 Ga. 50.    The contract in law had been complied with; and though the performance was not exact, it had been accepted."

There is another and a conclusive reason why this city cannot maintain any of the defenses it has interposed in this suit.    It is that it cannot accept the benefits and repudiate the burdens of its contract. It is that it cannot be heard to deny the truth of the representations of the existence and of the execution of this contract, which its records and its conduct have constantly made, and in reliance upon which, the gas company and the water company constructed and extended the waterworks, and the bank and the bondholders loaned their money.    No principle is more universal in the jurisprudence of civilized nations, no principle is more equitable in itself, or more salutary in its effects, than that no one may, to the damage of another, deny the truth of statements and representations by which he has purposely or carelessly induced that other to change his situation. This principle is equitable, because it forbids the untruthful or culpably negligent deceiver from profiting by his own wrong, at the expense of the innocent purchaser or contractor who believed him. It is salutary, because it represses falsehood and fraud.    Paxson v. Brown, 27 U. S. App. 49, 60, 10 C. C. A. 135, 143, and 61 Fed. 874, 881; Pence v. Arbuckle, 22 Minn. 417; Cairncross v. Lorimer, 3 Macq. 827, 829; Dickerson v. Colgrove, 100 U. S. 578, 582; Faxton v. Faxon, 28 Mich. 159; Kirk v. Hamilton, 102 U. S. 68, 75; Evans v. Snyder, 64 Mo. 516.    This principle is as applicable to the transactions of corporations as to those of individuals.    As Mr. Justice Campbell well said in Zabriskie v. Railroad Co., 23 How. 381, 400, 401, in which the supreme court held that a corporation was estopped to question the validity of its void guaranty, because it had permitted the circulation of the bonds that carried it:

"A corporation, quite as much as an individual, is held to a careful adherence to truth in all their dealings with mankind, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct had superinduced."

The Omaha Bridge Cases, 10 U. S. App. 98, 188, 190, 2 C. C. A. 174, 239, 240, and 51 Fed. 309, 326, 327; Butler v. Cockrill, 20 C. C. A. 122, 73 Fed. 945.

In a business transaction like that of procuring the construction of waterworks and the use of water for itself and its inhabitants, a municipality is subject to this principle to the same extent as a private corporation.    The same rules govern its business transactions that govern the negotiations of private individuals and corporations. Safety Insulated Wire & Cable Co. v. City of Baltimore, 13 C. C. A. 375, 377, 378, 66 Fed. 140, 143, 144; San Francisco Gas Co. v. City of San Francisco, 9 Cal. 453, 468, 469, 471; Columbus Waterworks Co. v. City of Columbus, 48 Kan. 99, 113, 28 Pac. 1097, 1102; Fergus Falls Water Co. v. City of Fergus Falls, 65 Fed. 586, 591; National Life Ins. Co. v. Board of Education of City of Huron, 27 U. S. App. 244, 10 C. C. A. 637, and 62 Fed. 778; National Tube-Works Co. v. City of Chamberlain (Dak.) 37 N. W. 761, 762; Com. v. City of Philadelphia, 132 Pa. St. 288, 19 Atl. 136; New Orleans Gaslight Co.

v. City of New Orleans, 42 La. Ann. 188, 192, 7 South. 559; Tacoma Hotel Co. v. Tacoma Light & Water Co., 3 Wash. St. 316, 325, 28 Pac. 516, 519; Wagner v. City of Rock Island, 146 Ill. 139, 34 N. E. 545; City of Vincennes v. Citizens' Gaslight Co., 132 Ind, 114, 126, 31 N. E. 573, 577; City of Indianapolis v. Indianapolis Gaslight & Coke Co., 66 Ind. 396, 403; Read v. Atlantic City, 49 N. J. Law, 558, 562, 9 Atl. 759, 761.

The city of Arkansas City spread upon the records of its city council an ordinance, approved by its mayor, which purported to be an offer to the gas company to pay the rentals whose recovery is sought in this suit, in consideration that the company would construct and operate these waterworks. The company accepted the supposed offer, and at the expense of thousands of dollars constructed and operated the works according to the terms of the ordinance, under the express direction of the city council. The city accepted the original plant by a resolution spread upon its records, by which the city council enacted that "the waterworks erected by the Interstate Gas Company under Ordinance No. 27 be, and hereby are, accepted by the city." By this ordinance the city had promised to pay the gas company and its successors $60 per annum as rental for each hydrant erected thereunder. After 100 hydrants had been erected and connected with the works, and when the city was paying rental for them, according to this contract, the Arkansas City Water Company, the then owner of the waterworks, mortgaged them, and pledged these accruing rentals to secure the $150,000, to collect which this suit was brought. The trust deed which secures this money provided that only $100,000 of the bonds secured by it should issue upon the existing security, but that bonds to the amount of $50,000 more might be issued upon certificates that the works had, subsequent to September 24, 1887, been so extended that the revenues from the hydrant rentals on the extensions would pay interest on the additional bonds. Bonds to the amount of $100,000 were immediately issued, and sold in open market, upon the faith of this contract by the city, its performance by the mortgagor evidenced by the acceptance of the city council and by the fact that the latter had paid the rentals under it for 14 months without protest. How can that city now be heard to say to the holders of these bonds that all these representations were false, that it had no power to make this contract, or that it never made it, or that it was never performed, when it still continues to take and use the water from the hydrants? It cannot. The supreme court of Kansas, in placing its seal of condemnation upon a proposition to sustain a like defense in Columbus Waterworks Co. v. City of Columbus, 48 Kan. 99, 113, 28 Pac. 1097, 1102, said: "To hold the latter proposition, when the parties cannot be placed in the same condition they were in when the contract was executed, would be a violation of the plainest rules of good faith."

But this is not all. After this mortgage was made, the city council of this city, by motions duly carried and resolutions properly passed, accepted 75 additional hydrants, erected upon extensions of these works made under its orders, and its city clerk certified over the seal of the city that these hydrants had been erected and accepted by

the city upon extensions of the plant made after September 24, 1887, according to the provisions of the original ordinance, and that certain rentals had accrued thereon from the city, which were sufficient in amount to pay the interest on the remaining $50,000 of bonds. These certificates were presented to the trustee under the trust deed, and in reliance upon them, and upon the records of the city council upon which they were based, it issued the remaining bonds, and they have been purchased by their holders. The city has used these hydrants to the present time. How can it be heard to say to these bondholders that it is liable to pay no rent for this use, because the pipe on the extensions was too small, and the hydrants were improperly located? The city and the mortgagor fixed the size of the pipe. The city located the hydrants, and when all was done it induced the trustee and the bondholders to part with the money that was used to pay for them by its representations that they were properly constructed to make it liable for the rentals it agreed to pay for their use. Upon every principle of justice and of equity, it is too late now for it to deny the truth of these representations, while it retains the benefits they procured for it. It must return the $50,000 and interest which its acts and conduct induced the bondholders to part with before it can be heard to say that the representations they made were false.

All the issues presented in this case that are worthy of extended consideration have now been disposed of. The questions presented by the appeal of the receiver have become immaterial, and need no consideration, because the decree must be reversed, and the questions he sought to present have been determined in the consideration we have given to the appeal of the bank. All questions concerning the validity of the mortgage and the title to be acquired under it are foreclosed by the purchase of the property from the mortgagor, subject to the mortgage, by the city. The city now stands in the shoes of the mortgagor as to all the mortgaged property, and is bound in good faith to preserve, maintain, and apply the waterworks and their income as a primary fund sacredly pledged to the payment of the mortgage debt. Kilpatrick v. Haley, 27 U. S. App. 752, 13 C. C. A. 480, 483, 484, and 66 Fed. 133, 136, 137; Drury v. Holden, 121 Ill. 130, 13 N. E. 547; Byington v. Fountain, 61 Iowa, 512, 16 N. W. 534.

The Ordinance No. 304, by which the city in terms repealed Ordinance No. 27, on which the contract for the waterworks was founded, was, of course, void as against the trustee and the bondholders, because it impaired the obligation of a contract.

The court is unanimous in the opinion that the decree below must be reversed, and that, in addition to the ordinary provisions for the foreclosure of a trust deed and the sale of the property covered by it, the decree should adjudge the existence and validity of the contract between the city and the gas company and its successor, the water company, the terms of which are disclosed by Ordinance No. 27, the erection by the gas company, the due acceptance by the city, and its liability to pay the rental for the original 50 hydrants, according to the terms of that ordinance. It should adjudge that the receiver is entitled to receive the rents of these 50 hydrants from the city of

'Arkansas City from October 1, 1891, until he delivers the plant to a purchaser under the decree. It should determine the amount of those rents to the time of the entry, of the decree, and should order their immediate payment to the receiver by the city. In accordance with the opinion of the majority of the court, the decree should leave the question of the liability of the city for the rental of the additional 129 hydrants undetermined and unaffected by these proceedings, so that it may be subsequently litigated by the receiver, the purchaser at the sale, or any other person who shall demand of the city the right to these rentals.

Let the decree be reversed, with costs against the city of Arkansas City in No. 672, and against Hopper, receiver, in No. 673, and let the case be remanded, with directions to the court below to enter a decree in conformity with the opinion of the court.