JACKSON COUNTY HORSE R. CO. *v.* INTERSTATE RAPID TRANSIT RY. CO.[1]

*Circuit Court, D. Kansas.   March 3, 1885.)*

MUNICIPAL CORPORATIONS — GRANT OF EXCLUSIVE PRIVILEGE TO STREET RAILWAYS — POWER OF KANSAS CITY, KANSAS — ELEVATED RAILROAD — INJUNCTION.

In 1872 the city of Kansas, in Kansas, passed an ordinance granting to the Kansas City & Wyandotte Street Railway Company "the sole right, for the space of 21 years, to construct, maintain, and operate their railway over and along all the streets in said city," subject to restrictions as to grade and condition of road.   In 1881 the company leased to the Jackson County Horse Railroad Company a part of its road running through a certain street, and in 1883 the city passed another ordinance granting to the Interstate Rapid Transit Railway Company the right to construct and operate an elevated railroad through certain streets, including the street occupied by the Jackson County Horse Railroad Company, which filed a bill to enjoin the building of the elevated road.   *Held,* that so much of the ordinance of 1872 as purported to give exclusive privileges to the lessor or to complainant was beyond the powers vested

[1]Reported by Robertson Howard, Esq., of the St. Paul bar.

in the city of Kansas and void, and that complainant had no right to challenge the validity of the ordinance of 1883, or to restrain defendant from building its road.

In Equity.

*John C. Tarsney* and *B. F. Stringfellow,* for complainant.

*J. P. Usher, W. C. Stewart,* and *W. Freeman,* for defendant.

BREWER, J. In this case I shall notice but a single question, and that because such question, vital to this controversy, was recently made by me the subject of a careful examination; and the opinion then formed has not been changed by the able and exhaustive arguments of the learned counsel for complainant.

In the case of the *Atchison Street Ry. Co.* v. *Missouri Pac. Ry. Co.,* decided by the supreme court of Kansas last spring, and reported in 31 Kan. 660, S. C. 3 Pac. Rep. 284, in which case I was charged with the duty of preparing the opinion of the court, the right of a street railway to occupy the streets of the city was challenged. There, as here, the city had passed an ordinance giving to the street railway company the exclusive right to occupy the streets with its railway for a term of years. There, as here, the city was given by its charter general supervision and control of the streets, but was not given, in express terms, power to authorize street railroads. In other words, the power vested in the city and the extent to which that power had been exercised by the city are alike. The court did not decide the precise question here presented, but expressly declined to give any opinion thereon, holding that, under the grant of general supervision and control of the streets, the city had power to *permit* the occupation of its streets by a street railroad. But obviously there was opened for inquiry the broad question of the powers of a city under such a general grant, and that question was made, as I have stated heretofore, the subject of full and careful investigation. To guard against any possible misapprehension, let me here state that in what I shall hereafter say I am in no manner speaking for that court, or expressing the conclusions reached by my associates, but am only giving my own views formed then, and strengthened by the arguments presented now.

The precise question is, had the city of Kansas the power to grant for a term of years the exclusive right to occupy its streets with street railroads? That question must be answered in the negative. Let me in the outset formulate two or three unquestioned propositions: (1) The legislature has, as the general representative of the public, the power, subject to specific constitutional limitations, to grant special privileges; (2) it may, with similar limitations, grant the like power to municipal corporations as to all matters of a purely municipal nature; but, (3) as the possession by one individual of a privilege not open to acquisition by others apparently conflicts with that equality of rights which is the underlying principle of social organization and popular government, he who claims such exclusive privilege

must show clear warrant of title, if not also probable corresponding benefit to the public. Hence the familiar rule that charters, grants of franchises, privileges, etc., are to be construed in favor of the government. Doubts as to what is granted are resolved in favor of the grantor, or, as often epigrammatically said, a doubt destroys a grant.

Now, coming closely to the question, the legislature has not in terms given to the city the power of granting an exclusive privilege of occupying the streets with railroads; it has not in terms given to it the right to contract away its continuous control of the streets, and its future judgment of the needs of the public in those streets, by a surrender of their occupation, for railroad purposes, to individuals for a series of years. Indeed, it has not in terms made any specific grant in respect to the occupation of streets by railroads, and their operation thereon.

Upon what, then, can it be claimed that the city has the power to give to an individual the right to occupy the streets with railroads, secure him that right for a term of years, and also the right of debarring, during such term, every other citizen from a like use of the streets? It was held in the *Atchison Case, supra,* that the city might *permit* a street railroad, and this because the legislature had granted to it a general control and supervision of the streets. In this the current of opinion and authority was followed. Under such power the city may permit any ordinary use of a street as a street. A street railroad comes within the ordinary scope of such use. But power to permit one citizen to use the streets in a given way is a very different thing from power to give such citizen the right to keep every other citizen from a like use of the streets. The one is a mere street regulation—a license; the other rises into the dignity of a contract—a franchise. The one may rest upon the ordinary powers of street management and control, the other requires the support of a special grant.

Doubtless the city may practically secure exclusive occupation to one railway company; *i. e.,* by giving permission to one, and withholding permission from all others, the occupation of that one becomes, for the time being, exclusive. But that is an altogether different matter. In the one case the exclusiveness depends on the continuous will of the city; in the other upon that of the individual company. In the one the full and constant control of the streets is retained; in the other it is partially transferred to the company.

Again, exclusiveness of occupation is not necessary to the full performance of a street railroad company of all its functions. The running of a street railroad on one street is in no manner interfered with by the running of a similar road on a parallel street. Doubtless the profits of the one will be increased if the other is stopped. Monopoly implies increase of profits. But the question of profits is very different from that of the unimpeded facilities for transacting business. The latter may be granted without any exclusiveness. And power to grant all facilities for transacting busi-

ness does not imply power to forbid all others from transacting like business. Even where a charter is granted by the legislature directly, it grants no exclusive right, unless the exclusiveness is expressly named. As said by Judge DILLON, 2 Mun. Corp. § 727:

"But a legislative grant of authority to construct a street railway is not exclusive, unless so declared in terms, and therefore the legislature may at will, and without compensation to the first company, authorize a second railway on the same streets or line, unless it has disabled itself by making the first grant irreparable and exclusive."

And if a direct grant from a legislature carries no implication of exclusiveness, why should it be presumed that the legislature intended to vest in a city the power to give exclusive privileges, when it has in terms granted no such power? Will the power to create monopolies be presumed unless it is expressly withheld? That would reverse the settled rule of construction, which is that nothing in the way of exclusiveness or monopoly passes, unless expressly named. It will not do to say that the grant of general supervision and control of the streets carries with it, by implication, the power to give exclusive privileges; for that grant implies a vesting in the city of continuous control. It is no authority for surrendering its constant supervision and management to any other corporation or individual. It implies that the city to-day, to-morrow, and so long as the grant remains, shall exercise its constant judgment as to the needs of the public in the streets, and not that it may to-day surrender to an individual or a private corporation the right of determining a score of years hence what the public may then need. The city may to-day determine that one street railroad will answer all the wants of the public, and so give the privilege of occupying the streets to but a single company. Ten years hence its judgment may be that two railroads are needed. Where is the language in the charter which restricts it from carrying such judgment into effect by giving a like privilege to a second company? It is doubtless true, as counsel say, that capital is timid, and will not undertake such enterprises without abundant guaranties and undoubted security. But this suggests matters of policy, and presents considerations for the legislature. It does not aid in determining what powers have been granted, or in the construction of charters or ordinances. When the legislature deems that the public interests require that cities should be invested with power to grant exclusive privileges, it will say so in unmistakable terms, as it already has in some instances. Till then courts must deny the possession of such power.

Decided cases on this question are few in number, yet these all speak one voice. In *Davis* v. *The Mayor, etc.*, 14 N. Y. 506, it appeared that the city council had passed a resolution granting to a company the privilege of constructing and maintaining for a term of years a street railroad in Broadway, in the city of New York. The city had simply the general supervision and control of streets, as in

the case at bar. The court of appeals held the resolution void; that the city had no power to make such a grant; and while some of the judges thought that the city might permit the occupation of the street by a street railway company, all agreed that so much of the resolution as purported to bind the city for a term of years, and thus practically divest it of full control over the street, was beyond the powers granted to it. In Cooley, Const. Lim. (2d Ed.) 207, it is said that "a corporation, having power under its charter to establish and regulate streets, cannot, under this authority, without explicit legislative consent, permit an individual to lay down a railway in one of its streets, and confer privileges exclusive in their character." *People* v. *Kerr,* 27 N. Y. 188; *State* v. *Gas-light Co.* 18 Ohio St. 262; *Gaslight Co.* v. *Gas Co.* 25 Conn. 20; *Mayor* v. *Railroad Co.* 26 Pa. St. 355; *Com.* v. *Railroad Co.* 27 Pa. St. 339.

My conclusion, then, is that so much of the ordinance as purported to give exclusive privileges to the lessor or complainant was beyond the powers vested in the city of Kansas, and therefore void. It has no right, therefore, to challenge the validity of the ordinance giving defendant its privileges, or to restrain the defendant from building its road. Whatever of annoyance or inconvenience the latter's road may cause, passes among those consequential injuries which give no cause of action. It must suffer these just as the citizen who uses the street where its road is constructed suffers some annoyance and inconvenience, and occasionally loss, and still without any action against it. *Pro bona publico* all suffer somewhat.

I have considered in this case the exclusiveness of complainant's rights, but, before closing, let me suggest whether, even if it had exclusive right as to street railroads, the defendant's road would be an invasion of that right. In other words, is an elevated road technically a street railroad? Can any company having a street railroad charter, without further authority, construct an elevated railroad? I do not care to enter into any discussion of this question, but merely suggest it as one which may sometime become of importance.

The bill will be dismissed, with costs.