NOE *et al.* v. MAYOR AND ALDERMEN OF TOWN .OF
MORRISTOWN.*

(*Knoxville.* September Term, 1913.)

1. MUNICIPAL CORPORATIONS. Governmental powers. Ex-
clusive franchise.

The ordinances of Morristown, providing for the selection of
places for the inspection of animals to be slaughtered for food
and for their sale at such places, and confirming a contract with
a company, which ordinances, when construed together, made
the premises of that company the only place for the inspection
and slaughter of animals, are void as not being within the
powers conferred by the charter of Morristown (Acts 1903, ch.
103.) (*Post, pp.* 353, 354.)

Cases cited and approved: Jackson County Horse R. Co. v.
Interstate Rapid Transit R. Co. (C. C.), 24 Fed., 306; Detroit.
Citizens Street R. Co. v. Detroit R. Co., 171 U. S., 48.

2. MUNICIPAL CORPORATIONS. Legislative control. Grant
of franchise.

The power to grant an exclusive franchise, even of the limited
class which may be granted within the city, must be expressly
conferred upon the municipality by the legislature. (*Post, p.*
354.)

3. MUNICIPAL CORPORATIONS. Power to grant. Constitu-
tional provisions.

Under Const., art. 1, sec. 22, forbidding perpetuities, and monopo-
lies, the legislature cannot confer upon a municipality the power·

---

*On the question of the power of the legislature in respect to·
municipal franchises, see note in 48 L. R. A., 485.

As to the power of a city to prohibit slaughtering except at
certain places, see note in 24 L. R. A., 586.

Noe v. Mayor and Aldermen.

to grant an exclusive franchise for the conduct of a business which is of common right. (*Post, pp.* 354-356.)

Constitution cited and construed: Sec. 22, art. 1.

Cases cited and approved: Memphis Street Railroad Co. v. City of Memphis, 44 Tenn., 406; Railroad Co. v. Memphis, 3 Shan. Cas., 198; City of Memphis v. Memphis Water Co., 52 Tenn., 495; Leeper v. State, 103 Tenn., 500.

4. **MUNICIPAL CORPORATIONS.** Governmental powers. Municipal slaughterhouse.

While the legislature might authorize a municipal corporation to establish a single slaughterhouse, to be conducted by its own agents, it would have to provide that all persons having animals to be slaughtered should have the right to resort to that place to do their own slaughtering, or to have it done by their own agents, or the act would be unconstitutional. (*Post, p.* 360.)

Cases cited and approved: Slaughterhouse Case, 16 Wall. (83 U. S.), 36; Gale v. Kalamazoo, 23 Mich., 344; City of Chicago v. Rumpff, 45 Ill., 90.

5. **MUNICIPAL CORPORATIONS.** Police power. Regulation of slaughterhouses.

The original ordinance of Morristown, providing for the selection of one or more places for the inspection and slaughtering of animals intended for food, when dissociated from the second ordinance and the contract selecting only one such place, recognizes that there may be more than one place of slaughter and more than one inspector, and is in the main sound. (*Post, p.* 361.)

6. **MUNICIPAL CORPORATIONS.** Police power. Delegation of municipality.

The provision of section 16 of that ordinance, conferring police power upon the inspector, is objectionable, as clothing him with powers which belong to the city, and not to an officer, except under ordinances defining his duty. (*Post, p.* 361.)

7. **MUNICIPAL CORPORATIONS.** Police powers. Delegation of municipality.

The provision of section 13 of that ordinance, giving an inspector absolute power to dispose of condemned meat as he might deem best for the public health, is objectionable, since that matter should be controlled by law, and not by the mere will of the inspector.   (*Post*, *p.* 361.)

8. **MUNICIPAL CORPORATIONS.** Validity of ordinances. Prescribing weight of evidence.

The provisions of that ordinance that certain acts should be "sufficient" evidence, rather than "*prima facie*" evidence, that the goods were on sale, are objectionable.   (*Post*, *p.* 362.)

Case cited and approved:  Brinkley v. State, 125 Tenn., 371.

---

FROM HAMBLEN.

---

Appeal from and Error to Chancery Court, Hamblen County.—HUGH G. KYLE, Chancellor.

McCANLESS & COLEMAN and J. O. PHILLIPS, for plaintiffs.

EARNEST R. TAYLOR and W. N. HICKEY, for defendant.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The bill in the present case was filed by certain butchers engaged in their business in Morristown, challenging the constitutionality of certain ordinances of the town.

The first ordinance was passed March 7, 1913, and provided in substance that the board should select one or more places for the inspection of animals intended for slaughter in Morristown, and for sale there for local food purposes. A subsequent ordinance was passed confirming a contract made with the Morristown Produce & Ice Company, whereby, when construed in connection with the original ordinance, the premises of the company referred to were made in substance and effect the only place for the inspection and slaughtering of such animals. No provisions were made for complainants, or others situated in the like case, to slaughter their own animals. On the contrary, it resulted, as a necessary construction of the two ordinances and the contract made part of the second ordinance, that the place of slaughter was to be under the sole control of the Morristown Produce & Ice Company, and the work to be done only by it; the animals to be killed at that company's place by it, after first being inspected there by the inspector selected by the municipality, and the meat to be likewise there inspected and slaughtered. After this the owners were at liberty to remove and sell it.

Did the mayor and aldermen have power to pass such ordinances?

1. While there is a limited class of exclusive franchises which may be granted within a city, the power to make such grant must be expressly conferred upon the municipality by the legislature. There are no such

128 Tenn. 23

special provisions in the charter of Morristown. Acts of 1903, ch. 103.

That such power can exist in a municipality only when expressly conferred by the legislature is clear under the authorities. 3 Abb. Munic. Corp., secs. 921-926; *Jackson County Horse R. Co. v. Interstate Rapid Transit R. Co.* (C. C.), 24 Fed., 306; *Detroit Citizens Street R. Co.* v. *Detroit R. Co.*, 171 U. S., 48, 18 Sup. Ct., 732, 43 L. Ed., 67.

The same rule was laid down by this court in the case of *Memphis Street Railroad Co.* v. *City of Memphis,* 4 Cold., 406, and *Railroad Co.* v. *Memphis,* 3 Shan. Cas., 198. But we do not know any cases in which such power may be conferred upon a city, even by the legislature, as to any occupation or business within common right, because even the legislature is forbidden to create a monopoly. The only cases wherein such power is conceded to the legislature in behalf of a city are those in which the business was not of common right. *City of Memphis* v. *Memphis Water Co.*, 5 Heisk., 495. In that case, as in many other cases, the distinction was taken that it was not a matter of common right for anyone to tear up the streets of a city to put in water mains and water pipes generally, a thing essential in establishing a water plant. We are referred to the case of *Leeper* v. *State,* 103 Tenn., 500, 53 S. W., 962, 48 L. R. A., 167, as a case in opposition to the view just stated, but an attentive examination of that case will show the contrary. The fundamental reason running all through the opinion of the court

in that case was that the public school system was an institution of the State, and the provision made for its schools in the way of making contracts with a single person for all the books to be used, and in fixing the prices at which they were to be sold, was merely a contract by the state similar to one under which supplies for one of its departments are secured. It was pointed out in that opinion that no restriction was placed upon the right of anyone to sell to any private school, and no interference whatever was attempted in respect of that matter. It is immaterial that prior to that time the legislature had not undertaken to provide for its schools. The same may be said of the penitentiary, and of the record books to be used in the offices of the secretary of State, the treasurer, and the comptroller. The fact that these officers have hitherto been permitted to buy from anyone they might deem proper could not forestall the right of the State to purchase supplies for either one of these departments from any individual, or to give him the exclusive right of selling to these departments—that is, to the State itself—under bids open to all dealers. In this respect the State would have the same right any other individual would have to buy supplies. In the case referred to the State advertised for bids, at which anybody that desired might offer books, with the understanding the State would select the books it deemed the best and the cheapest. The fact that the State did not itself pay for the books, but arranged for depots or depositories at which the patrons of the public schools

themselves might buy the books at the price fixed by the contract between the State and the wholesale dealer, could not alter the principle. So we do not doubt that a city, like a private corporation, or like an individual, even, might buy its individual supplies of stationery, work tools, etc., from any dealer it might choose. That, however, is a different question altogether from one in which the city undertakes to take charge of a business, which before was of common right, declaring that this should be conducted at only a single place and by a single person, and thereby debar all of us from engaging in that business. This would be a pure monopoly forbidden by our constitution, which reads:

"That perpetuities and monopolies are contrary to the genius of a free State and shall not be allowed." Article 1, sec. 22.

We are referred to the *Slaughterhouse Case*, 16 Wall. (83 U. S.), 36, 21 L. Ed., 394, as an authority in support of such a monopoly. That case does hold that it was within the power of the legislature of the State of Louisiana to establish such a monopoly as to the place where the slaughter was to be done, but distinctly pointed out that at that place everybody was permitted to do their own slaughtering, and the company in charge of the place was bound under heavy penalties to permit them. This distinction would render that case inappropriate as an authority here; likewise the fact that it was established by the legislature and not by a municipal corporation. Moreover, we are not prepared to admit that it would be within the power

Noe v. Mayor and Aldermen.

of the legislature of a State even to create such a monopoly. The following from section 192 of McQuillin on Municipal Ordinances, containing an excerpt from the opinion of Judge Cooley in *Gale* v. *Kalamazoo*, 23 Mich., 344, 9 Am. Rep., 80, seems to us to state the true doctrine, subject to the qualification we state at the close of the next excerpt hereinafter quoted: "A contract with a village to build a market house and to put it under control of the village for ten years, in consideration that the rents thereof would be paid to the grantee, to appoint a person to superintend it, permit no other market house to be erected or used, nor articles specified sold elsewhere in the village during the ten years, was held void by the supreme court of Michigan as against public policy. The reasons for the doctrine are thus clearly given by Cooley, J., who delivered the opinion of the court: 'If a municipal corporation can preclude itself in this manner from establishing markets whenever they may be thought desirable, or from abolishing them when thought undesirable, it must have the right also to agree that it will not open streets, or grade or pave such as are opened, or introduce water for its citizens, except from some specified source, or buy fire engines of any other than some stipulated kind, or contract for any public work except with persons named; and if it might do these things, it is easy to perceive that it might not be long before the incorporation itself, instead of being a convenience to its citizens, would have been used in various ways to compel them to submit to innumera-

ble inconveniences, and would itself constitute a public nuisance of the most serious and troublesome description. Individual citizens, looking only to the furtherance of their private interest, might, in various directions, engage it in permanent contracts, which, while ostensibly for the public benefit, would impose obligations precluding further improvements and depriving the town prospectively of those advantages and conveniences which the municipality was created to supply, and without which it is worthless. For, if the village might bind itself to some market house for ten years, it might do so for all time to come; and if it might agree that improvements and conveniences of one class ought to be confined by contract to one quarter of the town, a reckless or improvident board might agree with a greedy or unscrupulous proprietor of town lots, that all improvements of every description should be so located or made as to conduce to his benefit, irrespective to the general good. . . . It is impossible to predicate reasonableness of any contract by which the governing authority abdicates any of its legislative powers, and precludes itself from meeting in the proper way the emergencies that may arise. Those powers are conferred in order to be exercised again and again, as may be found needful or politic, and those who hold them in trust to-day are vested with no discretion to circumscribe their limits or diminish their efficiency, but must transmit them unimpaired to their successors. This is one of the fundamental maxims of government, and it is impossible that

free government, with restrictions for the protection of individual or municipal rights, could long exist without its recognition." In *City of Chicago* v. *Rumpff*, 45 Ill., 90, it appeared that the city was authorized by its charter to regulate and license the slaughtering of animals within its limits. Under this ordinance a particular building was selected for the purpose, and the right to do the slaughtering was committed to one person, to whom certain charges were to be paid by the persons who applied to him for his services, and every one had the right to so apply. This was attacked as a monopoly. The court said:

"The charter authorizes the city authorities to license or regulate such establishments. Where that body has made the necessary regulations required for the health or comfort of the inhabitants, all persons inclined to pursue such an occupation should have an opportunity of conforming to such regulations; otherwise, the ordinance would be unreasonable and tend to oppression. Or, if they should regard it for the interest of the city that such establishments should be licensed, the ordinance should be so framed that all persons desiring it might obtain licenses by conforming to the prescribed terms and regulations for the government of all such business. We regard it neither as a regulation nor a license of the business to confine it to one building or to give it to one individual. Such an action is oppressive, and creates a monopoly that never could have been contemplated by the general assembly. It impairs the rights of all other persons, and

cuts them off from a share in not only a legal, but a necessary, business. Whether we consider this as an ordinance or a contract it is equally unauthorized, as being opposed to the rules governing the adoption of municipal by-laws. The principle of equality of rights to the corporators is violated by this contract. If the common council may require all of the animals for the consumption of the city to be slaughtered in a single building, or on a particular lot, and the owner to be paid a specific sum for the privilege, what would prevent the making a similar contract with some other person that all of the vegetables or fruits, the flour, the groceries, the dry goods, or other commodities should be sold on his lot, and he receive a compensation for the privilege? We can see no difference in principle." See, also, 2 Dillon on Munic. Corp. (5 Ed.), sec. 668, and note.

We do not doubt that the legislature might authorize a municipal corporation to establish either by purchase or rental a single slaughterhouse, to be conducted by the agents or employees of the municipal corporation itself. But such legislative acts, in order to be constitutional, would have to provide that all persons having animals to be slaughtered should have the right to resort to that place and do their own slaughtering, or have it done by their own agents, or by persons of their own selection.

It follows that the chancellor was correct in holding void the contract with the Morristown Produce & Ice Company.

It is said that he was inconsistent in maintaining the validity of the original ordinance, and at the same time in stamping the contract, which is made a part of the second ordinance, as void. The original ordinance, while containing some objectionable features, is in the main sound. It does not when dissociated from the second ordinance and the contract therein adopted, provide for the selection of a single place for the work, or the appointment of a single individual to do the slaughtering. It recognizes that there may be more places than one. It recognizes, also, that there may be more inspectors than one, providing, as it does, for an assistant inspector, who, however, the bill charges, was not appointed, and that the corporation would not appoint him. So it was possible, under the original ordinances, standing alone, to have several places of inspection, and several places of slaughter.

There are some points, however, about this original ordinance that we think are worthy of special observation. For example, section 16 clothes the inspector with police powers. These powers belong to the city itself, and not to an officer of the city, except under ordinances defining his duty. Under the same theory section 13 gives to the inspector the absolute power to dispose of "condemned animals and meat as he may deem best for the good of the public health." This is a matter that

also should be controlled by law, and not by the mere will of the inspector.

We are of the opinion that the strictures made on section 1 of the ordinance of March 7th, that certain acts shall be deemed "sufficient" evidence that the goods are on sale, are well taken. It would have been proper to write, in the place of "sufficient evidence," "*prima facie* evidence." *Brinkley* v. *State*, 125 Tenn., 371, 384-385, 143 S. W., 1120.

It results that the decree of the chancellor is affirmed in part, modified in part, and reversed in part. The effect of all of which is that the demurrer is overruled, and that the case must go back to the chancery court for hearing on the answer, and for further proceedings. The defendants will pay the costs of the appeal.